COMMISSIONER OF INTERNAL REVENUE, Respondent
Marks v. Comm'r
Docket No. 6116-81.
United States Tax Court
T.C. Memo 1985-179; 1985 Tax Ct. Memo LEXIS 453; 49 T.C.M. (CCH) 1222; T.C.M. (RIA) 85179; April 10, 1985. *453 A, a partnership, purchased the leased fee interest in a shopping center. Held, the proper allocation of A's cost basis in the shopping center between land and depreciable improvements in determined. Morton L. Friedman, for the petitioners. Claire Priestley-Cady, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioners' Federal income taxes of $4,130 for 1975, $19,788 for 1976, and $18,824 for 1977. The sole issue for decision is how the basis in a shopping center should be allocated between land and improvements for the purpose of determining the amount of depreciation allowable on the improvements. FINDINGS *454 OF FACT Some of the facts have been stipulated, and those facts are so found. Furthermore, some facts and evidence, set forth in the Commissioner's motion to compel stipulation, have been deemed accepted and established by our order dated June 2, 1982. The petitioners, Dennis N. and Nancy S. Marks, husband and wife, maintained their legal residence in Carmichael, Calif., at the time they filed their petition in this case. They filed their joint Federal income tax returns for 1975 through 1977 with the Internal Revenue Service Center, Fresno, Calif. Mr. Marks will sometimes be referred to as the petitioner. During the years in issue, the petitioner owned a 33-1/3 percent share of Arden Fair Associates (the partnership), a partnership formed in May 1975 for the purpose of purchasing the Arden Fair Shopping Center (shopping center). Ernest Johnson and Morton Friedman were the only other partners in the partnership, and each owned a 33-1/3 percent interest during the period in issue. Mr. Friedman is the petitioners' attorney in this case. The shopping center is situated in Sacramento, Calif., approximately 4 miles northeast of the city's central business district. The shopping *455 center fronts on Arden Way, a major, four-lane traffic corridor, and is about one-quarter mile east of the interchange of Interstate Highway 80 and Arden Way. Directly across from the shopping center, on the south side of Arden Way, is the Point West development. Point West is a large, mixed-use development of office buildings, motels, strip shopping centers, and apartments, which, despite the economic recession of 1975, was at that time one of Sacramento's growing real estate markets. Properties in the Point West neighborhood were appreciating at a rate of about 5 percent a year in the mid-1970s. The shopping center is a regional shopping facility anchored by a Sears store and a Weinstock's department store. The portion of the shopping center purchased by the partnership does not include the Sears and Weinstock's stores; it consists of two buildings and landscaped parking areas lying on either side of the Weinstock's store. The building lying to the west of the Weinstock's store (and to the east of the Sears store) contains a total of 258,671 square feet, including basement retail and storage areas, and has an air conditioned central mall. The building lying to the east of *456 the Weinstock's store contains a total of 126,334 square feet, including a basement area, but has no central mall. Originally constructed in 1962, the two buildings had been expanded over the years preceding their sale to the partnership by the addition of new stores and the enclosed mall. However, the record does not reveal the exact dates on which such improvements were made. The partnership further improved the buildings after it acquired the shopping center by enclosing an open-air mall between the Weinstock's store and the mall building lying to the west of it, by remodeling the existing enclosed mall, and by adding movie theaters and more stores. The entire property purchased encompasses approximately 280,314 square feet of leasable building space and 1,122,159 square feet (about 25.76 acres) of land. In mid-1975, the shopping center had a vacancy rate of about 8 percent. The vacancy rate subsequently dropped to 4.1 percent by March 1976 and to 3.8 percent by September 1976. In 1975, the shopping center generated rental income, including tax escalation charges, of approximately $926,000, and other income, including common area fees and mall charges, of about $134,000. Operating *457 expenses and real estate taxes amounted to about 45 percent of total income in that year. The partnership purchased the shopping center from Kavanau Real Estate Trust (Kavanau) on May 15, 1975, for $6,399,454.31. The sale agreement was executed by Mr. Friedman on behalf of the partnership. Under the terms of the agreement, the purchase price was allocated as follows: Land
$ 773,020.00
Building
5,586,673.31
Furniture, equipment,
and fixtures
39,761.00
Total
$6,399,454.31
Prior to the sale, neither party to the sale obtained an appraisal of the property which allocated the purchase price between land and improvements. The partnership did not secure an appraisal allocating the purchase price between land and improvements until September 1983 when preparing for the trial of this case. The partnership acquired a leased fee interest in the shopping center because the property was encumbered by valuable leasehold interests possessed by some pre-existing tenants. A leasehold interest has value when the contract rent which a tenant is obligated to pay is less than the fair market rent which the leased property could command in a competitive real estate market. *458 A leased fee interest in property refers to the property rights of an owner of commercial or income-producing property, which generally consist of the right to receive the actual contract rent that the property is generating over the remaining terms of the outstanding leases on the property, plus the reversionary right to receive the property back upon the expiration of the leases; whereas, a fee simple absolute (or fee simple unencumbered) interest in property includes all property rights that an owner can have in property, exclusive of governmental restrictions on the property, such as the powers of taxation, condemnation, or eminent domain. In other words, the value of a leased fee interest is the fair market value of the property in fee simple absolute, less the value of any leasehold interests which affect the property. For real property tax purposes, the Sacramento County Assessor's Office (the assessor's office) appraised the fee simple absolute value of the shopping center and allocated such value between land and improvements. The property purchased by the partnership consists of four parcels for property tax assessment purposes. The assessor's office maintains a separate, *459 written appraisal record for each of the four parcels. The following table summarizes the records of the appraiser's office concerning the value of the four parcels: Value of
Value of
Total Value
Year
Land
Improvements
of Fee Simple
1975
$1,128,000
$4,350,000
$5,478,000
1976
1,128,000
5,875,000
7,003,000
1978
2,490,000
4,517,000
7,007,000
The appraised land value in 1975 and 1976 of $1,128,000 was originally established in 1967. The land value was not altered during the years between 1967 and 1978 because real property tax equalization laws would have required the assessor's office to reappraise the land value of all commercial properties in the surrounding area at the same time. Consequently, during the intervening years, any increase in the property's appraised value was allocated to improvements. During 1975, the assessor's office reappraised many of the shopping centers in Sacramento County, including the Arden Fair Shopping Center. Darrel Holmes, a senior real property appraiser in the assessor's office, reappraised three of the four parcels purchased by the partnership (the 1975 reappraisal).[1] The reappraised value was effective *460 March 1, 1976. Using three different appraisal methods, including two versions of the income approach and a gross rent multiplier approach, he calculated values of the fee simple ranging from $7,000,000 to $7,470,000. He concluded that the fee simple absolute value of the three parcels was $7,000,000. The partnership appealed the 1975 reappraisal to the Sacramento County Assessment Appeals Board. In its appeal, the partnership contended that there were no leasehold interests in the property and that, consequently, the fee simple value of the parcels did not exceed $6,399,454.31, the amount which the partnership had paid for the property in 1975. However, the appeals board upheld the assessor's valuation of $7,000,000. In the 1975 reappraisal, Mr. Holmes did not attempt to separately determine the fair market value of the land and improvements. *461 The overall increase in the appraised value of the shopping center was allocated solely to the improvements because the assessor's office did not wish to reappraise the land in all surrounding commercial properties. However, in 1978, due to the passage of Proposition 13 in California, the assessor's office was required to appraise land and improvements at their fair market value as of March 1, 1975, or, if later, as of the date of the most recent transfer, sale, or new construction. Since the shopping center was sold in May 1975 and since such date roughly coincided with the 1975 reappraisal of the three parcels, the assessor's office retained its overall assessment of $7,000,000 for the three parcels. The fourth parcel's value as of May 1975 was appraised at $7,000. Mr. Holmes, on behalf of the assessor's office, then allocated the fair market value of the fee simple absolute ($7,007,000) between land and improvements (the Proposition 13 reallocation). Applying the comparable sales (or market) approach to valuation, he appraised the fair market value of the land if vacant at $2.25 per square foot, or $2,490,000, in May 1975. [2] Subtracting the value of the land from $7,007,000, *462 he concluded that the improvements had a fair market value in May 1975 of $4,517,000. On its partnership returns of income for the years in issue, the partnership claimed a depreciable basis in, and depreciation deductions on, the shopping center buildings and improvements made to the buildings after their acquisition, as follows: Year
Cost Basis [3]
Depreciation
1975
$5,705,647.30
$141,104.67
1976
5,965,222.43
250,106.79
1977
[4] 6,022,168.00
223,494.00
The buildings were depreciated under the straight-line method, using a 25-year useful life. On each of its returns for the years 1975 through 1977, the partnership claimed depreciation deductions for machinery and other equipment in addition to the depreciation claimed for buildings and improvements. *463 On their Federal income tax returns for 1975 through 1977, the petitioners claimed a distributive share of losses sustained by the partnership in those years. In his notice of deficiency, the Commissioner disallowed a portion of the petitioners' claimed distributive share of the partnership losses in such years on the ground that the partnership's depreciation deductions for the improvements were not allowable in the amounts claimed. He determined that the buildings had a 37-year useful life and that the partnership had a cost basis in the shopping center improvements and land of $6,359,693.00, of which $3,257,132.00 was allocable to improvements and $3,102,561.00 was allocable to land. He did not contest that $39,761.00 of the $6,399,454.31 paid by the partnership for the shopping center was allocable to furniture, equipment, and fixtures, as stated in the sale agreement between the partnership and Kavanau. On brief, the Commissioner had conceded that the shopping center improvements have a 25-year useful life. The partnership has a cost basis in the shopping center property of $6,399,454.31. Of its total cost basis, $6,359,693.31 is allocable to land and improvements, and *464 such amount was the fair market value in May 1975 of the leased fee interest acquired by the partnership in the shopping center. OPINION The sole issue for decision is the amount deductible by the partnership during the years in issue for depreciation of the improvements located on its shopping center property. The resolution of this issue depends on the allocation of $6,359,693.31 of the purchase price of the property between land and the depreciable improvements. For purposes of the depreciation deduction, where improvements and land are purchased for a lump sum, the basis or cost must be allocated between the depreciable and nondepreciable property according to their respective fair market values at the time of acquisition. Secs. 1.167(a)-2 and -5, Income Tax Regs. The parties agree that the fair market value of the leased fee interest acquired by the partnership in the shopping center was $6,359,693.31 in May 1975, the time of acquisition. Thus, our inquiry focuses on the value in May 1975 of the partnership's leased fee interest in the property's component parts, i.e., land and improvements. The petitioners have abandoned the allocation made on the partnership's tax *465 returns. They now contend that the allocation of the purchase price to land and buildings contained in the sale agreement between Kavanau and the partnership accurately reflects the respective fair market values of the land and improvements. They maintain that the sale agreement allocation was the product of arm's-length negotiations and is supported by the appraisal of their expert witness, David E. Lane. Neither the Commissioner nor this Court is bound to accept an allocation of a lump-sum purchase price made under a contract of sale. Generally, a contractual allocation will be upheld if it has "some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." , affg. . An allocation by the buyer and the seller will be ignored if it is unrealistic ( , affg. on this issue a Memorandum Opinion of this Court; , *466 affg. or is not a result of arm's-length negotiations between parties with adverse tax motivations ( ; . In the present case, the only evidence that the allocation between land and buildings made in the sale agreement was the result of arm's-length negotiations is the uncorroborated testimony of petitioners' counsel and partner in the partnership, Mr. Friedman. No one representing Kavanau, the other party to the sale, testified at trial, and even Mr. Friedman's testimony on this issue was sketchy. He gave no details of the negotiations. He merely made the conclusory statement that the parties to the sale negotiated the allocation at arm's length.There is no evidence to indicate whether Kavanau had any interest in negotiating a different allocation more beneficial to its interests, or whether Kavanau had any opposing tax interests at all. We simply cannot conclude on such meager evidence that the allocation made in the sale agreement was the product of arm's - length negotiations. Furthermore, there is *467 no evidence to indicate that either party to the sale possessed any expertise in valuing properties, and the fact that neither party to the sale obtained an independent appraisal of the relative values of the land and improvements prior to the sale indicates that the economic reality of the allocation is questionable at best. . In fact, as an examination of the evidence and the experts' appraisals reveals, the allocation does not reflect economic reality. Both the petitioners and the Commissioner engaged independent, professional appraisers to estimate the proper allocation of the purchase price. The Commissioner also called Mr. Holmes of the assessor's office to testify to the appraisals which he made in 1975 and 1978 on behalf of that office. Both appraisers employed by the parties have received the M.A.I. (Member of the American Institute of Real Estate Appraisers) designation, and all three appraisers were well qualified to assess the property involved here. As already stated, the parties agree that the purchase price of $6,359,693.31 was within the range of the fair market value of the leased fee *468 interest acquired by the partnership. The primary disagreement between the parties (and their experts) concerns the proper appraisal method to be used to determine the portion of the purchase price allocable to the depreciable improvements. The allocation in the present case is complicated by the fact that the partnership acquired a leased fee interest rather than a fee simple absolute (or fee simple unencumbered) interest in the property. A leased fee interest is less valuable than a fee simple absolute interest when there exist valuable leasehold interests possessed by lessees enjoying long-term leases at below-market rents. See . Where rental property is unencumbered by such leasehold interests, the fair market value of the lessor's fee simple absolute interest, if known, can be allocated between land and improvements by determining the fair market value of the land, at its highest and best use and as though vacant, and then simply subtracting the value of the land from the total value of the fee to arrive at the portion of the fee's value allocable to improvements. . *469 It is the Commissioner's position that the same method may be applied here even though the partnership purchased a leased fee interest in the shopping center. He maintains that any reduction in the value of the property resulting from the existence of leasehold interests affects the value of building improvements only and, consequently, that the purchase price of the leased fee interest may be allocated between land and improvements by subtracting the fair market value of the land as though vacant from the purchase price to arrive at the value of the improvements as encumbered by the leaseholds. This valuation approach was utilized by his expert, Thomas W. Clark. However, though the Commissioner urges us to adopt Mr. Clark's appraisal method, he does not rely upon Mr. Clark's appraisal of the land at $1.55 per square foot, or $1,750,000. [5] The Commissioner contends that the land's fair market value was actually equivalent to its assessed value of $2,490,000 (approximately $2.22 per square foot), as determined by Mr. Holmes of the assessor's office in the Proposition 13 reallocation.Subtracting $2,490,000.00 from the purchase price, the Commissioner maintains that the partnership *470 has a cost basis in the improvements of $3,869,693.31. [6]
It is the petitioners' position that leasehold interests reduce the value of the lessor's interest in the land as well as the improvements. To reflect this mutual reduction in his allocation of the purchase price of the leased fee interest, Mr. Lane, the petitioners' expert, first computed the fair market value of a hypothetical fee simple absolute interest in the shopping center. He concluded that the fair market value of a fee simple absolute interest was $8,300,000 in May 1975. Mr. Lane then estimated that the value of the land if vacant was *471 $1,130,000 ($1 per square foot) [7] in May 1975, or 13.6 percent of the fair market value of a fee simple absolute interest. Once he determined that the price which the partnership paid for the leased fee interest was in fact within the range of its fair market value, Mr. Lane multiplied the purchase price by 13.6 percent to arrive at the portion of such price allocable to land, $864,918. The remainder of the purchase price, $5,494,771, was allocated to improvements. As in many valuation cases, neither party's position is entirely persuasive. With respect to the primary point of disagreement, the question of whether a leasehold interests reduces the value of the lessor's fee interest in improvements alone or in both improvements and land, we agree with the petitioners. The shopping center property was encumbered by several long-term leases at below-market contract rents. The tenants possessing such leases *472 occupy the land on which their particular stores are located in addition to the store buildings themselves. The leasehold interests possessed by these tenants reduce the value of the partnership's interest in the land as well as the buildings because their contractual right to occupy the land and buildings prevents the partnership from re-renting such properties at market rates or from destroying the buildings and using the land for another, perhaps more profitable, purpose. The Commissioner's contention that the leaseholds do not affect land value because "land value always exists" ignores the fact that the partnership is prevented by the existence of long-term leases from currently receiving a fair market return on the land. Consequently, it is unrealistic to contend that the value of the partnership's interest in the land is equivalent to the value of the land at its highest and best use and as though vacant. See American Institute of Real Estate Appraisers, The Appraisal of Real Estate, 251 (8th ed. 1983). We shall accordingly apply the approach of the petitioners' expert. In order to apply such approach, we must first determine the value of a hypothetical fee simple absolute *473 interest in the shopping center and the portion thereof allocable to land. Of the three appraisers, only Mr. Lane and Mr. Holmes appraised a fee simple absolute interest. Mr. Lane and Mr. Holmes each used three different methods of appraisal, the results of which are summarized below: Value of Fee Simple Absolute Interest Mr. Lane
Income approach--expenses of 40%
(including real estate taxes),
capitalization rate of 10%
$8,150,000
Cost approach
$8,655,000
Gross rent multiplier approach [8]
$8,300,000
Conclusion--weighted average of three
estimates
$8,300,000
Mr. Holmes
Income approach--expenses of 45%
(including real estate taxes),
capitalization rate of 9.5%
$7,200,000
Income approach--expenses of 26%
(excluding real estate taxes),
capitalization rate of 13.1%
$7,000,000
Gross rent multiplier approach
$7,470,000
Conclusion
$7,000,000
For the reasons stated below, we find that a fee simple absolute interest in the shopping center would have had a value of $8,193,000 in May 1975. *474 Our valuation is based on the income, or capitalization of earnings, approach. Both Mr. Lane and Mr. Holmes agree that an income approach is the most reliable method of appraisal for commercial properties, including the shopping center involved here. By determining a property's value through the capitalization of its anticipated annual income at a market rate of return, the income approach reflects the fact that an investor generally purchases property for the income which it is expected to produce. See Encyclopedia of Real Estate Appraising 41 (3d ed. 1978). The cost approach, applied by Mr. Lane, is of questionable accuracy when the property is no longer new (see Encyclopedia of Real Estate Appraising, supra at 443), and the gross rent multiplier approach, applied by both Mr. Lane and Mr. Holmes, requires that the appraiser have access to the earnings information of comparable shopping centers, information which is generally unavailable (see American Institute of Real Estate Appraisers, The Appraisal of Real Estate, supra at 358). Mr. Lane acknowledged that he felt the gross rent multiplier approach to be "quite weak, because most of the sales [of shopping centers] *475 that are found have some of the same problems regarding leasehold estates and you virtually have to appraise the sale in order to get any data that would be meaningful for the subject property." Application of the income (capitalization of earnings) approach has been approved by this Court. ; , affd. on this issue ; . Furthermore, we are more comfortable applying the income approach in the present case because the record contains more evidence pertinent to the application of such method than to the other methods. The valuation of a fee simple absolute interest under the income approach is based on the market rent that the property could achieve in a competitive real estate market. The annual gross rental income, as computed at market rates, is added to any other income which the property generates to arrive at annual gross income. Net operating income is calculated by adjusting gross income for estimated vacancies and expenses, and *476 it is then capitalized at an appropriate rate. American Institute of Real Estate Appraisers, The Appraisal of Real Estate, supra at 357, 359; Encyclopedia of Real Estate Appraising, supra at 41-44. In applying the income approach, the appraisers have differed on every figure involved in the computation. We accept neither appraisser's computation in its entirety. We estimate an average market rent of $4.75 per square foot of leasable space per year, essentially splitting the difference between the average market rents employed by Mr. Lane and Mr. Holmes, who both claimed to have based their estimates on the most recent leases negotiated in the shopping center itself. [9] The annual gross income figure must also include $134,000 of other income, such as common area and mall charges, which was included by Mr. Holmes in his computation, but overlooked by Mr. Lane. In calculating the shopping center's net operating income, we conclude that allowances of 7-1/2 percent for estimated vacancies and 40 percent for expenses (including real estate taxes) are appropriate. The 7-1/2 percent vacancy rate, used by Mr. Lane, is closer to the property's actual vacancy rate in 1975. Although *477 the actual vacancy rate dropped below 4 percent by late 1976, the drop is unexplained and may have been caused by additional partnership expenditures for improvements. [10] The 45-percent expense rate, used by Mr. Holmes, was the property's actual rate of expenses in 1976, but since the market rent exceeded the actual rent, we have concluded that the lower percentage, 40 percent, suggested by Mr. Lane, is more appropriate. Finally, we conclude that net operating income should be capitalized at an overall rate of 10 percent. A 10-percent capitalization rate was applied by Mr. Lane and supported by the Commissioner's expert, Mr. Clark, who testified that a 10-percent rate was appropriate in 1975. [11]
*478 Having determined that a fee simple absolute interest in the shopping center would have been worth $8,193,000, it is now necessary to calculate the portion thereof allocable to land. All three appraisers estimated the value of the land as though vacant in May 1975 by use of the comparable sales approach. All agreed that a comparable property would be similar in size to the subject parcel, which contained 25.76 acres, because small parcels generally sell at a higher price per square foot than large parcels, and would be similarly zoned for commercial use, preferably shopping centers. Upon a careful examination of their respective appraisal reports and testimony, we adopt Mr. Clark's valuation of the land as though vacant of $1.55 per square foot. Mr. Clark considered eight sales, the first three of which were, of all the parcels relied upon by the appraisers, the most comparable to the property in question. These three parcels were comparable in size (they ranged in size from 10.0 acres to 49.8 acres), in location (they were situated directly across Arden Way), and in zoning (two were zoned for shopping centers, and the third was zoned agricultural but was eventually rezoned for *479 commercial development). They were sold during the period of November 1972 to August 1973 for prices ranging from $1.33 to $1.47 per square foot. After adjusting the prices of the largest and smallest for size, and allowing for a 5-percent per year rate of appreciation, Mr. Clark determined that the three properties had values in 1975 ranging from $1.50 to $1.70 per square foot. Mr. Lane appraised the land at $1.00 per square foot, but the sale which he primarily relied upon, the K-Mart site, was not sufficiently comparable to the property in question. The K-Mart site contained 14.356 acres and was zoned commercial, but it was located about 8 miles from the shopping center. None of the other sales used by the appraisers was located so far away. The other three sales mentioned by Mr. Lane [12] were close to the shopping center, and if adjusted for location, size, and time of sale, would, in our opinion, yield prices very close to Mr. Clark's estimate of $1.55. Mr. Holmes estimated that the land *480 had a value of $2.25 per square foot. However, most of the sales which he relied upon involved parcels much smaller than the shopping center site or parcels located outside the Point West neighborhood. Of the four sales in that neighborhood (sales numbered 1, 2, 3, and 7), two involved much smaller properties, and the other two involved parcels zoned for office buildings rather than shopping centers. Applying a value of $1.55 per square foot, we conclude that the land acquired by the partnership had a value, if vacant, of $1,739,000.00 in May 1975. [13] Such amount is 21.22 percent of the value of a fee simple absolute interest in the property. Therefore, we hold that an identical percentage of the fair market value of the partnership's leased fee interest in the property is allocable to land. Since the partnership's cost basis in the land and improvements is equivalent to their fair market value, we hold that $1,349,526.00 of its basis is allocable to land and $5,010,167.31 of its basis is allocable to depreciable improvements. *481 Decision will be entered under Rule 155.
Footnotes
1. In reappraising the property acquired by the partnership, Mr. Holmes inadvertently overlooked one of the parcels. The overlooked parcel is 3,000 square feet in size and contains parking lot improvements but no buildings. In 1967, it was appraised by the assessor's office at $3,000, and its value was not adjusted again until 1978.↩
2. Although Mr. Holmes concluded that the land was worth $2.25 per square foot, his total valuation of $2,490,000, when divided by 1,122,159 square feet, results in a value per square foot of approximately $2.22. The discrepancy is due to the fact that Mr. Holmes separately calculated the land value of each parcel and then "rounded" each figure.↩
3. The cost basis figures in the table for 1976 and 1977 have not been adjusted by the amount of depreciation claimed in prior years. From an examination of the partnership's returns for 1975 through 1977, it appears that the difference between the cost basis claimed on the 1975 and 1976 returns and the amount of the shopping center's purchase price allocated to buildings in the sale agreement ($5,586,673.31) may be attributable to amounts expended by the partnership for improvements to the buildings after their acquisition. However, there is no evidence in the record of the exact nature or cost of such improvements, and in their petition and briefs, the petitioners have not contended that their cost basis in the buildings should be increased by the cost of any improvements made by the partnership. ↩
4. On its 1977 return, the partnership allocated $5,587,347 of the cost basis shown in the table to buildings and allocated $434,821 of such basis to improvements made after the partnership's acquisition of the shopping center. The partnership claimed depreciation deductions in 1977 for these new improvements separately from its claimed depreciation for the buildings, and the Commissioner did not challenge such deductions in the notice of deficiency.↩
5. Mr. Clark estimated that the property acquired by the partnership contained 25.939 acres (1,129,903 square feet) of land, and he calculated the land's value by multiplying 1,129,903 by $1.55. He "rounded" the result of $1,751,350 to $1,750,000. We have found that, in fact, the land contained 25.76 acres, or 1,122,159 square feet, based on the records in the assessor's office; there is no explanation of the difference. ↩
6. The Commissioner has abandoned his position, taken in the notice of deficiency, that the partnership's cost basis in the improvements is $3,257,132.↩
7. Like Mr. Clark, Mr. Lane estimated that the property purchased contained 25.939 acres, or 1,129,903 square feet. He computed the value of the land if vacant by multiplying $1.00 by 1,129,903, to arrive at a value of $1,129,903, which he then "rounded" to $1,130,000.↩
8. In his appraisal report and testimony, Mr. Lane referred to his gross rent multiplier approach as a "market data" approach because the selection of a gross rent multiplier requires that the appraiser examine the income and values of comparable shopping centers.↩
9. We have examined their studies, and since we cannot ascertain which result is more reliable, we have adopted a compromise. ↩
10. See footnote 3, supra.↩
11. We have calculated the value of a fee simple absolute interest in the property as follows: Gross rental income: 280,314 sq. ft. at
$4.75 per sq. ft.
$1,331,491
Other income
134,000
Annual gross income
$1,465,491
Less: 7-1/2% vacancy rate
99,861
Annual effective gross income
$1,365,630
Less: Expenses at 40%
546,252
Annual net operating income
$ 819,378
Annual net operating income capitalized at 10% = $8,193,780 "rounded" to $8,193,000.↩
12. Mr. Lane testified that he could not verify the sales price of the third parcel on his comparables list and that he did not rely upon it. Therefore, we also do not rely upon it.↩
13. The land's value has been calculated by multiplying $1.55 by 1,122,159 square feet, the size of the property acquired. The result was "rounded" to $1,739,000.↩