T.C. Memo. 2005-235

UNITED STATES TAX COURT

ESTATE OF WEBSTER E. KELLEY, DECEASED, JOHN R. LOUDEN AND
PATRICIA L. LOUDEN, PERSONAL REPRESENTATIVES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16894-03.                    Filed October 11, 2005.

Larry W. Gibbs, for petitioner.

Kathryn F. Patterson, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Respondent determined a $136,679 deficiency
in the Federal estate tax of the Estate of Webster E. Kelley (the
estate).  The sole issue for decision is the fair market value of
Webster E. Kelley's (decedent) 94.83-percent interest in a family
limited partnership and one-third interest in a limited liability
company.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. John R. Louden and Patricia L. Louden (the Loudens), personal representatives of the estate, resided in Plano, Texas, at the time the petition was filed. Decedent resided in Plano, Texas, at the time of his death.

Decedent and his predeceased wife had one child, Patricia L. Louden. Patricia L. Louden is married to John R. Louden, and they have four children.

On April 6, 1999, decedent, Patricia L. Louden, and John R. Louden organized Kelley-Louden Business Properties, LLC (KLBP LLC), and Kelley-Louden, Ltd., a Texas limited partnership (KLLP). Between June 6 and September 11, 1999, decedent contributed $1,101,475 cash and certificates of deposit to KLLP. On September 13, 1999, the Loudens contributed $50,000 cash to KLLP.

At the time of decedent's death, December 8, 1999, decedent owned the following interests, the values of which are at issue in this case:

|  |  |
|---|---|
| KLBP LLC | 33.33 percent |
| KLLP | 94.83 percent |

The Loudens owned the remaining two-thirds interest in KLBP LLC. The Loudens also owned a 4.17-percent interest in KLLP. KLBP LLC owned the remaining 1-percent interest of KLLP which is the only asset of KLBP LLC. Therefore, we are valuing decedent's

interests of 94.83 percent in KLLP and of 33.33 percent in KLBP LLC.

On decedent's date of death, KLLP held assets totaling $1,226,421, which consisted of $807,271 cash and $419,150 in certificates of deposit, and had no liabilities.

In December 1999, the estate employed Appraisal Technologies, Inc. (ATI), to prepare a valuation of decedent's interests in these closely held entities. ATI concluded that a 53.5-percent valuation discount was applicable.[1]

On September 1, 2000, the estate filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, reporting decedent's 94.83-percent interest in KLLP at a value of $521,565 and his interest in KLBP LLC at a value of $1,833.33.

Respondent issued a notice of deficiency determining that the discounts claimed by the estate were too high and lower discounts were appropriate.[2] Respondent contends that the estate is entitled to a 25.2-percent discount.

---

[1] The estate states several times on brief that ATI used a 55.15-percent discount; however, in calculating the discounts applied by the estate, we find that ATI used a 53.5-percent discount.

[2] The statutory notice of deficiency sets forth numerous alternative arguments including arguments based on secs. 2035, 2036, 2038, and 2703. At trial, respondent conceded all the alternative arguments.

OPINION

I. <u>Burden of Proof</u>

As a general rule, the notice of deficiency is entitled to a presumption of correctness, and the taxpayer bears the burden of proving the Commissioner's deficiency determinations incorrect. Rule 142(a);[3] <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).[4] Section 7491(a), however, provides that if a taxpayer introduces credible evidence and meets certain other prerequisites, the Commissioner shall bear the burden of proof with respect to factual issues relating to the liability of the taxpayer for a tax imposed under subtitle A or B of the Internal Revenue Code (Code). For the burden to shift, however, the taxpayer must comply with the substantiation and record-keeping requirements as provided in the Code and have cooperated with the Commissioner. See sec. 7491(a)(2).

The estate did not claim that section 7491(a) applies. Accordingly, the burden remains on the estate.

---

[3] Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code as in effect at the time of decedent's death.

[4] The presumption of correctness does not apply when the Government's determination is a "'naked' assessment without any foundation whatsoever". <u>United States v. Janis</u>, 428 U.S. 433, 441 (1976). The estate argues that the notice of deficiency may not be entitled to a presumption of correctness if we conclude that the report of its expert, ATI, had no probative value. As we give some probative value to the ATI report, we conclude that this is not an issue.

II.  Fair Market Value of Decedent's Interests

    A.  Introduction

        1.  General Principles

Property includable in a decedent's gross estate generally is to be valued as of the date of the decedent's death.  Sec. 2031.  For purposes of the estate tax, property value is determined by finding the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts.  Sec. 20.2031-1(b), Estate Tax Regs.  The willing buyer and willing seller are hypothetical persons. Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990) (citing Estate of Bright v. United States, 658 F.2d 999, 1006 (5th Cir. 1981)).  The hypothetical buyer and seller are presumed to be dedicated to achieving the maximum economic advantage.  Id.

Valuation is a factual determination, and the trier of fact must weigh all relevant evidence of value and draw appropriate inferences.  Estate of Deputy v. Commissioner, T.C. Memo. 2003-176.

There are three common approaches to measure the interest in a closely held entity--the income approach, the net asset value (NAV) approach, and the market approach.  Id.  Value is determined under the income approach by computing a company's

income stream.  Estate of Jelke v. Commissioner, T.C. Memo. 2005-131.  Value is determined under the NAV approach by computing the aggregate value of the underlying assets as of a fixed point in time.  Id.  Value is computed under the market approach by comparison with arm's-length transactions involving similar companies.  Id.  The NAV approach is often given the greatest weight in valuing interests in an investment company.  See Estate of Ford v. Commissioner, T.C. Memo. 1993-580, affd. 53 F.3d 924, 927-928 (8th Cir. 1995) (citing Rev. Rul. 59-60, sec. 5, 1959-1 C.B. 237, 242).

After determining the NAV of KLLP and KLBP LLC, it is appropriate to discount decedent's interest in each entity to reflect lack of control and/or lack of marketability.  See Peracchio v. Commissioner, T.C. Memo. 2003-280.

2.  Expert Opinions

a.  In General

In deciding valuation cases, courts often look to the opinions of expert witnesses.  Each party in this case relies on an expert opinion to determine the values of the properties at issue.  We evaluate expert opinions in light of all the evidence in the record, and we are not bound by the opinion of any expert witness.  Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Shepherd v. Commissioner, 115 T.C. 376 (2000), affd. 283 F.3d 1258 (11th Cir. 2002).  We may reject, in whole or in part,

any expert opinion. Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998). Because valuation necessarily involves an approximation, the figure at which we arrive need not be directly traceable to specific testimony or a specific expert opinion if it is within the range of values that may be properly derived from consideration of all the evidence. Estate of True v. Commissioner, T.C. Memo. 2001-167 (citing Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285).

b. The Estate's Expert

The estate employed ATI in December of 1999 to prepare a valuation report for transfers decedent made at yearend. Decedent's death, however, converted the Federal gift tax valuation study into a Federal estate tax valuation study. The estate's communications regarding the valuation were solely with Ron Lint (Mr. Lint), the founder and president of ATI. Mr. Lint has the designation of accredited senior appraiser from the American Society of Appraisers (ASA). Mr. Lint testified that he assigned the valuation project to Jeff Mills (Mr. Mills), a subordinate at ATI, who also has the designation of accredited senior appraiser from the ASA. The valuation report was prepared and signed by Mr. Mills, but Mr. Lint adopted the report as his own.

ATI used the NAV approach and the income approach in determining the proper valuation of decedent's interests. ATI gave 80-percent weight to the NAV approach and 20-percent weight to the income approach.[5]

ATI appraised decedent's 94.83-percent limited partnership interest in KLLP at a fair market value of $521,565, applying a 53.5-percent valuation discount to the adjusted NAV of KLLP, and appraised decedent's one-third interest in KLBP LLC at $1,833.33, also applying a 53.5-percent valuation discount.

### c.  Respondent's Expert

Respondent submitted an expert report prepared by Raymond F. Widmer (Dr. Widmer). Dr. Widmer has a bachelor of arts degree in economics, a master of business administration degree with a concentration in economics and quantitative methods, and a Ph.D. in economics.

Dr. Widmer used the NAV approach and valued the interests using a 25.2-percent valuation discount. Applying this discount, Dr. Widmer determined a value of $869,970 for the 94.83-percent limited partner interest in KLLP and $3,055 for the one-third interest in KLBP LLC.

---

[5] At trial, the estate's expert, Mr. Lint, admitted that the income approach calculation in the ATI report was incorrect because, among other problems, it did not compound the earnings each year.

B.  Fair Market Value Before Discounts

As determined supra, the NAV method is generally an appropriate method to apply when computing the value of a nonoperating entity.  See Estate of Ford v. Commissioner, supra.  While more than one method may be used, giving appropriate weight as necessary, we find that in this case, where the interest to be valued is an interest in a family limited partnership whose assets consist solely of cash and certificates of deposit, the income approach should not be afforded more than minor weight.

The parties agree that the value of KLLP's assets on the valuation date, decedent's date of death, was $1,226,421, consisting of $807,271 cash and $419,150 in certificates of deposit and no liabilities.  Therefore, we use this as the NAV.

C.  Minority Interest (Lack of Control) Discount

1.  Introduction

Pursuant to the partnership agreement, a buyer of all or any portion of the transferred interests would have limited control of his investment.  A hypothetical willing buyer would account for this lack of control by demanding a reduced price; i.e., a price that is below the NAV of the pro rata share of the interest purchased in KLLP.  A minority discount will therefore apply in this case where a partner lacks control.  See Estate of Bischoff v. Commissioner, 69 T.C. 32, 49 (1977).

## 2. Determination of the Minority Interest Discount

Each expert witness determined a minority interest discount or discount for lack of control by reference to general equity closed-end funds. In a closed-end fund, the assets are brought together for professional management, and the shareholders have no control over the underlying assets. The owner of an interest does not have the ability to sell the underlying assets. The closed-end funds typically trade at a discount relative to their share of the NAV, and as the shares enjoy a high degree of marketability, the discounts must be attributable to some extent to a minority shareholder's lack of control over the investment fund. Peracchio v. Commissioner, T.C. Memo. 2003-280. Therefore, it is appropriate to compare the ownership of a partnership interest in KLLP to the ownership of a closed-end fund and apply an appropriate discount for lack of control.

Both experts divided the comparable closed-end funds into quartiles by price to NAV ratios. The first quartile represents the funds that are in high demand and therefore trade at premiums or low discounts. The fourth quartile represents the funds that are in low demand and trade at higher discounts.

### a. The Estate's Expert

In computing the minority discount, ATI determined that KLLP would be most comparable to the closed-end funds in the fourth quartile with price to NAV discounts of 21.8 percent to 25.5

percent. ATI considered several factors in making this determination, including: KLLP is smaller in size than a publicly traded fund; closed-end funds generally have a staff of analysts and professional managers devoted to the full-time management of the fund investments which reduces risk whereas KLLP is not managed in the same manner; closed-end funds offer diversification of the portfolio of investments while KLLP is not diversified; and KLLP does not have a performance history whereas most closed-end funds have a performance history of 5 to 10 years.

Once ATI determined an appropriate discount range of 21.8 percent to 25.5 percent, ATI then further adjusted the discount based on several factors and restrictions inherent in KLLP and using other partnership studies. One such study, published by Partnership Profiles, Inc. (PPI), found that the average discount for 18 publicly registered but nontraded miscellaneous partnerships, when the NAV of such partnerships was compared to the prices at which investors acquired units in them in the secondary market, was 29 percent. ATI also discussed another study published by PPI which compared the NAV of approximately 100 publicly registered but nontraded real estate partnerships with the prices at which investors acquired units in these partnerships in the secondary market. The average discount to NAV was 27 percent for the transactions studied. Therefore, ATI

used a 25-percent minority discount for valuing the interests in KLLP.

### b. Respondent's Expert

Dr. Widmer calculated a minority discount of 12 percent by calculating an arithmetic mean of the entire data set for closed-end funds, not only the fourth quartile. Dr. Widmer determined that it is essential to use the whole array of closed-end funds as this calculation will remove the marketability element in the discounts or premiums.

### 3. Conclusion

We are not persuaded that ATI's exclusive use of the fourth quartile of closed-end funds is proper. "While we have utilized small samples in other valuation contexts, we have also recognized the basic premise that '[a]s similarity to the company to be valued decreases, the number of required comparables increases'." McCord v. Commissioner, 120 T.C. 358, 384 (2003) (quoting Estate of Heck v. Commissioner, T.C. Memo. 2002-34); see also Lappo v. Commissioner, T.C. Memo. 2003-258. We are also not persuaded by ATI's analyses of PPI's studies regarding minority discounts as ATI admits that these discounts contain some element of discount for lack of marketability, and therefore these studies result in an overstatement of the minority discount.

In determining the minority discount for KLLP, we believe a correct analysis would be to take the arithmetic mean of all of

the closed-end funds, as shareholders in all closed-end funds lack control.  In using only the fourth quartile, ATI combined elements of the lack of marketability discount with the minority discount because the funds in the fourth quartile had the lowest demand and therefore the highest marketability discount.  As the lack of marketability will be dealt with in the discount for lack of marketability, see infra, we agree with respondent that ATI's discount for lack of control is too high and that it was incorrect to use solely the fourth quartile funds.

Although we find neither expert particularly persuasive on this issue, we will apply a 12-percent discount on the grounds that (1) respondent has effectively conceded that a discount factor of up to 12 percent would be appropriate, and (2) petitioner has failed to prove that a figure greater than 12 percent would be appropriate.  See Peracchio v. Commissioner, supra (using a 2-percent minority discount factor for the "cash and money market funds" asset category of a family limited partnership).

D.  Marketability Discount

1.  Introduction

A discount for lack of marketability is appropriate in valuing the interests in KLLP as there is not a ready market for partnership interests in a closely held partnership.  Estate of Newhouse v. Commissioner, 94 T.C. at 249.  Although both experts

agree that a lack of marketability discount should be applied to the partnership's NAV (after applying the minority interest discount), they disagree on the magnitude of that discount. See Peracchio v. Commissioner, T.C. Memo. 2003-280; see also Estate of Bailey v. Commissioner, T.C. Memo. 2002-152 (indicating that the application of a minority discount and a discount for lack of marketability is multiplicative rather than additive).

2. Determination of the Marketability Discount

There are several ways to determine a marketability discount. Two of the most common include the initial public offering (IPO) approach and the restricted stock approach. McCord v. Commissioner, supra at 387. IPO studies compare the private-market price of shares sold before a company goes public with the public-market prices obtained in the IPO of the shares or shortly thereafter. See id. Restricted stock studies compare private-market prices of unregistered (restricted) shares in public companies with the public-market prices of unrestricted but otherwise identical shares in the same corporations. See id. A variant of the restricted stock approach, the private placement approach, attempts to isolate the effect that impaired marketability has on the discount determined under the restricted stock approach. See id. at 388, 392.

This Court has concluded that the private placement approach is appropriate where the interest to be valued was part of an

investment company as the assessment and monitoring costs would be relatively low in the case of a sale of an interest in that company.  Id. at 394; Lappo v. Commissioner, supra.  KLLP is an investment company as 100 percent of its assets consist of cash and certificates of deposit.  See McCord v. Commissioner, supra.

### a.  The Estate's Expert

In determining the marketability discount, ATI used the restricted stock approach by drawing an analogy between partnership interests in KLLP and the common stock of a private, closely held corporation.  In doing so, ATI considered several restricted stock studies and their findings.

ATI also listed as barriers to marketability of a limited partnership interest in KLLP the following:  (1) Once admitted as a limited partner, one must continue as a limited partner until all partners unanimously consent to the admission of a substitute limited partner and to the withdrawal of the transferring partner, and the limited partner must execute legal documents as required by the general partner, who must receive and approve the documents in writing; (2) a limited partner can assign, transfer, encumber, or pledge all or part of his partnership interest only if such assignment is fully executed by assignor and assignee, such assignment is received by the partnership and recorded on the books, and the transfer is approved by unanimous vote of all the partners; (3) no partner has a property right in any of the

partnership property, regardless of whether specific property was contributed to the partnership by a given partner; (4) limited partnership interests are fully paid and nonassessable, and limited partners do not have the right to withdraw or reduce their capital contributions to the partnership; (5) limited partners could be asked to lend additional money to the partnership or increase their capital contributions and may have their partnership interests diluted if they do not increase their contribution and other partners do make additional contributions; (6) general partners are not liable personally for the return of capital contributions to the partnership, and limited partners have no recourse against general partners should their claims to assets remaining after liquidation and discharge of debts and obligations not be satisfied; (7) the general partner has sole discretion to determine whether to make distributions of any type; and (8) upon the dissolution of the partnership, the general partner acts as liquidator and has a reasonable amount of time to wind up the partnership assets, and therefore the limited partner may not obtain the final proceeds from an investment for 6 months or longer.

After considering all of these factors and the results of the restricted stock studies, ATI determined that a 38-percent marketability discount is appropriate for an interest in KLLP.

### b.  Respondent's Expert

Using the private placement approach, Dr. Widmer determined a 15-percent discount for lack of marketability on the basis of a study by Dr. Mukesh Bajaj, Bajaj, et al., "Firm Value and Marketability Discounts", 27 J. Corp. L. 89 (2001), which found that the private placement of unregistered shares has an average discount of about 14.09 percent higher than the average discount on registered placements.  Dr. Widmer also based this discount on the low risk of the partnership's portfolio.

### 3.  Conclusion

We are not persuaded by ATI's recommendation of a 38-percent marketability discount as the restricted stock studies referred to in ATI's expert report examine mostly operating companies, and there are fundamental differences between an investment company holding easily valued and liquid assets (cash and certificates of deposit), such as KLLP, and operating companies.  See Peracchio v. Commissioner, supra.  Moreover, ATI did not analyze the data from these studies as they related to the transferred interests herein, and therefore we cannot accept the premise that this average discount is appropriate.  See id.

We are also not persuaded by Dr. Widmer's recommendation of a 15-percent marketability discount.  While we agree that the Bajaj study is an appropriate tool in determining the lack of marketability discount, Dr. Widmer's conclusion based on the

study is not entirely accurate.  The Bajaj study states that the 14.09-percent discount, which Dr. Widmer focused on, is not solely a reflection of marketability discount but is also influenced by additional factors which have to be accounted for. Bajaj et al., <u>supra</u> at 107.  These factors depend on the fraction of total shares offered in the placement, business risk, financial distress of the firm, and total proceeds from the placement.  <u>Id.</u> at 107-109.

As we find the parties' assumptions and analyses concerning the marketability discount only minimally helpful, we use our own analysis and judgment, relying on the parties' experts' assistance where appropriate.  <u>Helvering v. Natl. Grocery Co.</u>, 304 U.S. at 295.

In <u>McCord v. Commissioner</u>, 120 T.C. at 394-395, we focused on the Bajaj study and found that a 20-percent marketability discount was appropriate for interests in a family limited partnership classified as an investment company.  Dr. Bajaj divided the private placements into three groups according to the level of discounts--the 29 lowest discounts, the middle 29 discounts, and the 30 highest discounts.  <u>Id.</u> at 394.  The low discount group, with a discount of 2.21 percent, is dominated by registered private placements which did not suffer from impaired marketability.  <u>Id.</u>  The high discount group, with a discount of 43.33 percent, is dominated by unregistered private placements

which, unlike the sale of an interest in an investment company, have relatively high assessment and monitoring costs.  Id.  As these characteristics do not reflect the characteristics of an investment company, we concluded in McCord, as we do here, that the partnership is in the middle discount group, and a discount of 20 percent (rounded from 20.36 percent) is applicable.  Id. In McCord, we did not refine the 20-percent discount any further to incorporate specific characteristics of the partnership at issue as we were not persuaded that we could refine the figure. Id. at 395.

In Lappo v. Commissioner, T.C. Memo. 2003-258, we found that a 21-percent initial discount was appropriate for an interest in a family limited partnership consisting of marketable securities and real estate subject to a long-term lease.  We then made a further upward adjustment of 3 percent to the marketability discount accounting for characteristics specific to the partnership, including:  The partnership was closely held with no real prospect of becoming publicly held; the partnership was relatively small and not well known; there did not exist a present market for the partnership interests; and the partnership had a right of first refusal to purchase the interests.  Id.  As these characteristics are similar to the characteristics in KLLP, we find that a 3-percent upward adjustment is applicable.

Therefore, we hold that a 20-percent initial marketability discount is appropriate. We further find that an upward adjustment of 3 percent is proper to incorporate characteristics specific to the partnership.

E. Conclusion

On the basis of all the evidence and using our best judgment, we conclude that a 12-percent minority discount and a 23-percent marketability discount are appropriate in valuing the interests in KLLP. The fair market value of the 94.83-percent limited partnership interest is $788,059 computed as follows:

| | |
|---|---|
| Total NAV as of 12/8/99 | $1,226,421 |
| 94.83 percent of NAV | 1,163,015 |
| Less:  12-percent minority interest discount | (139,562) |
| | 1,023,453 |
| Less:  23-percent marketability discount | (235,394) |
| FMV of 94.83-percent interest | 788,059 |

We conclude that the fair market value of the 33.33-percent interest in KLBP LLC, the sole asset of KLBP LLC being a 1-percent general partnership interest in KLLP, is $2,770 computed as follows:

| | |
|---|---|
| Total NAV as of 12/8/99 | $1,226,421 |
| 33.33 percent of 1 percent of NAV | 4,088 |
| Less:  12-percent minority interest discount | (491) |
| | 3,597 |
| Less:  23-percent marketability discount | (827) |
| FMV of 33.33 percent of 1-percent interest | 2,770 |

To reflect the foregoing,

Decision will be entered

under Rule 155.