T.C. Memo. 2021-17

UNITED STATES TAX COURT

ESTATE OF MIRIAM M. WARNE, DECEASED, WILLIAM R. WARNE AND
THOMAS H. WARNE, CO-EXECUTORS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 7019-18, 7020-18.            Filed February 18, 2021.

James M. Kamman and Lisa O. Nelson, for petitioners.

Jenny R. Casey, Kim-Khanh Nguyen, and Erin Kathleen Salel, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, Judge:  During the final years of her life, Miriam Warne gave

fractional interests in limited liability companies (LLCs) to her family members.

The LLCs were owned by a family trust and held ground leases in various

properties in California.  When Ms. Warne died, the family trust held the

[*2] remaining interests in the LLCs. Her estate also donated its entire interest in an LCC by splitting that donation between two charitable organizations, with 25% going to a church and the remaining 75% to a family foundation.

The Commissioner issued notices of deficiency determining a gift tax deficiency for 2012 and an estate tax deficiency. In calculating the gift and estate tax deficiencies, the Commissioner determined an increased fair market value of the LLCs on the basis of his valuations of the ground leases. In calculating the estate tax deficiency, the Commissioner also determined more modest discounts for lack of control and marketability than the estate had used for the remaining LLC interests held by the estate. And the Commissioner determined that a discount should be applied when calculating the value of the split donation.

The Court valued the properties and the discounts relying on testimony from the parties' experts. Because both parties' experts had shortcomings in their analyses, the Court made its own valuations relying on the experts' testimony and underlying data. Likewise, we considered the experts' testimony in determining appropriate discounts for the LLCs. Regarding the split donation, we conclude that a discount may apply when valuing the donation of a property that is split among charities.

[*3]                                   FINDINGS OF FACT

Miriam and Thomas Warne were married and resided in California.  The couple had two sons, William R. Warne and Thomas (Tom) H. Warne, and three granddaughters.  Thomas Warne died in 1999; Miriam Warne died in 2014.  William and Tom are coexecuters of Miriam's estate, and they resided in California when the petitions in these cases were filed.

I.     The LLCs

In 1981, Thomas and Miriam Warne created the Warne Family Trust (Family Trust).  Over the years, the Family Trust became the majority interest holder of five LLCs:  WRW Properties, LLC (WRW); Warne Ranch, LLC; VJK Properties, LLC (VJK);[1] Warne Investments, LLC; and Royal Gardens, LLC (collectively, five LLCs).  Miriam Warne, as trustee, served as the managing member of each LLC.

       A.     WRW Properties

WRW operated as a real estate holding company.  It held two leased-fee interests in real estate in Westminster, California:  Tres Vidas Apartments (Tres Vidas) and Brookhurst Town Center.

---

[1]VJK was originally organized under the name THW Properties, LLC.  In 2002, the company changed its name to VJK Properties, LLC.

**[*4]**        1.        Tres Vidas

Tres Vidas was land improved with multifamily apartment buildings.  In 1975, Miriam and Thomas Warne entered into a ground lease as landlords with a partnership, Thoner, Birmingham, Lindley, & Smith (TBLS), as tenants.

The ground lease established monthly rent payments until a rent reset in 2003 determined a new base fair market value of the land; a percentage of that new base fair market value would dictate the rent payments for the duration of the lease. To find a new base fair market value, the lease required the Warnes and TBLS to use a three-appraiser process.  In this process, each party appoints an appraiser to value the land.  If the appointed appraisers cannot agree on a fair market value, the appraisers choose a third appraiser to value the property.  The two appraisals closest in value are then averaged to reach the new base fair market value.

In 1986, the parties amended the lease.  The amendment extended the lease term to 2046 and pushed the rent reset to December 31, 2016.  It also required the appraisers for the rent reset to base the fair market value of Tres Vidas on its then-existing use, exclusive of building improvements.  At all relevant times, TBLS was the ground tenant of Tres Vidas.

[*5]       2.       <u>Brookhurst Town Center</u>

WRW's other real estate holding was Brookhurst Town Center, which consisted of land improved by a retail shopping center. In 1986, Miriam and Thomas Warne entered into a ground lease for Brookhurst Town Center as landlords. At all relevant times, Brookhurst Town Center, LLC (BTC LLC), was the tenant of Brookhurst Town Center.

In 2012, BTC LLC and the Family Trust amended the lease to require cost of living adjustments to the rent payments every five years. The amendment also required a rent reset following a three-appraisal process similar to the process in the Tres Vidas lease. The lease amendment required rent resets 30 years and 60 years from formation of the lease based on the fair market value of the property excluding building improvements. The ground lease is set to expire in 2063.

       3.       <u>WRW Operating Agreement</u>

WRW was originally formed as a single-member LLC with the Family Trust as its sole member. William Warne was admitted as a member in 2003. In 2006, WRW's operating agreement was amended to acknowledge William Warne's admission as a member and to name Miriam Warne as WRW's manager.

The operating agreement vests considerable power in the majority interest holder. The agreement provides that the majority interest holder appoints WRW's

[*6] manager and may remove the manager with or without cause. Except as expressly provided in the agreement, the manager has "full, complete and absolute power and authority to manage and conduct the business and affairs" of WRW. The majority interest holder, in conjunction with the manager, may elect to dissolve WRW.

The Family Trust, with Miriam Warne as trustee, was WRW's majority interest holder. The operating agreement also named Miriam Warne as the managing member, making her both the trustee of the majority interest holder and the manager of WRW.

The operating agreement also established protocols that members must follow before transferring their interests. A member may not dissolve an interest or withdraw from the WRW without consent from the other members. Similarly, if a member wishes to sell an interest to anyone who is not an immediate family member,[2] the selling member must provide written notification to the remaining members. This written notification is an offer that gives the remaining members the right of first refusal to buy the seller's interest. WRW makes quarterly distributions in accordance with percentage interests.

---

[2]The operating agreement defines an immediate family member as "the husband, wife, adult child, father, mother or adult grandchild of the Member, trustees for any of the foregoing, or trustees for minor lineal."

[*7] B.    VJK Properties

Like WRW, VJK operated as a real estate holding company.  VJK held a fee simple interest in property named Former Spires and a leased fee interest in Windmill Apartments (Windmill), both in Westminster, California.  Because the parties stipulated the fair market value of Former Spires, Windmill is the only VJK property we must value.

1.    Windmill

Miriam and Thomas Warne entered into the Windmill ground lease as landlords in 1973.  Like Tres Vidas, Windmill is improved by a multifamily apartment complex.

The parties to the Windmill lease amended it in 1986.  The amendment extended the lease term to 2046 and established a rent reset on December 31, 2016.  The rent reset followed the same three-appraiser process as Tres Vidas and required that the appraisals base the fair market value of the property on its then existing use.

2.    VJK Operating Agreement

VJK was created as a single-member LLC in 2000, wholly owned by the Family Trust.  The operating agreement was not updated when more members acquired interests.

**[*8]** C.     Warne Ranch

Warne Ranch is an LLC the stated purpose of which was to own and operate a farm.

### 1.     Property Held by Warne Ranch

The fair market value of the property held by Warne Ranch is not in dispute.

### 2.     Warne Ranch Operating Agreement

The Warne Ranch operating agreement was entered into in 1995. The Family Trust, with Miriam Warne as trustee, held a 99% interest in the LLC, and Thomas Warne held a 1% interest.

The agreement grants any majority interest holder considerable power over the company's operations. A majority interest holder may unilaterally dissolve Warne Ranch. A majority interest holder has the power to control the business functions of the LLC, including the power to manage real estate holdings and make business decisions. However, any member of Warne Ranch may bind the LLC on any instrument, arrangement, or document when the LLC is a party to the arrangement.

The operating agreement also grants a majority interest holder veto power over transfers. A member may transfer an interest only with prior written consent from a member or members owning more than a 50% interest. If the transfer is

**[*9]** made without prior written consent, the transfer is void. Any new member accepted into the LLC must pay all reasonable expenses in connection with admission and must execute any instrument the members "may deem necessary or desirable to effectuate such admission."

Warne Ranch makes distributions in accordance with the members' percentage interests.

### D.  Warne Investments

Warne Investments was an LLC that operated as a holding company for a fee simple interest in real estate.

#### 1.  Warne Investments Property

Warne Investments held property surrounding a gas station in Westminster, California. The value of that property is not at issue.

#### 2.  Warne Investments Operating Agreement

Warne Investments was created by "Trust 'W' of the Warne Family Trust" with Miriam Warne as trustee and "Trust 'H' of the Warne Family Trust" with Miriam Warne and James Moore as cotrustees (Trust W and Trust H, respectively). Trust W owned 87.432% of Warne Investments, and Trust H owned the remaining 12.568%.

**[*10]** As with the other operating agreements, the Warne Investments operating agreement granted the majority interest holder considerable influence in the company. The majority interest holder can appoint and remove the manager. The manager--subject to express limitations--"shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company." The majority interest holder must give consent before the manager performs the tasks enumerated in the express limitations. The manager and the majority interest holder may elect to dissolve the LLC without input from the other members. The operating agreement listed Miriam Warne as Warne Investments' manager.

Warne Investments' operating agreement contains the same right of first refusal provision as WRW's. A member wishing to sell its interest outside the family must send written notification to the manager, who then forwards the notice to the remaining members. This written notification serves as an offer that gives the remaining members the right of first refusal to buy the interest. If an outside sale is accepted, the new member must adhere to specific conditions of membership.

[*11] E.    Royal Gardens

Royal Gardens was a single-member LLC wholly owned by the Family Trust.  Royal Gardens held a leased fee interest in a mobile home park known as Royal Gardens Estate.  Before trial, the parties stipulated that the value of Royal Gardens is $25,614,695.

II.    Gifts and Property Holdings as of Date of Death

On December 27, 2012, Miriam Warne gave fractions of the five LLCs to her sons and granddaughters.  On February 20, 2014, Miriam Warne died.

At the time of Miriam Warne's death, the LLCs had the following ownership structure:  WRW was held 78% by the Family Trust and 22% by William Warne; VJK was held 86.3% by the Family Trust, 0.5% by Tom Warne, and 4.4% by each of the three granddaughters; Warne Ranch was held 72.5% by the Family Trust, 26% by Tom Warne, and 0.5% by each granddaughter; Warne Investments was held 87.432% by the Family Trust and 12.568% by Trust "H"; and Royal Gardens was held 100% by the Family Trust.  William Warne and Tom Warne were cotrustees of the Family Trust.  They are also coexecutors of Miriam Warne's estate.

In the Ninth Amendment to the Family Trust agreement, Miriam Warne left 75% of her interest in Royal Gardens to the Warne Family Charitable Foundation

**[\*12]** (Foundation) and the remaining 25% to St. John's Lutheran Church (Church). The parties stipulated that the Foundation and the Church are charitable organizations under section 501(c)(3) and that donations to those organizations are deductible under sections 170(c) and 2055.[3]

III.    The Returns

On May 19, 2015, Miriam Warne's estate filed Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, on her behalf. According to that return, Miriam Warne gave William Warne an 18% interest in WRW and gave Tom Warne a 22% interest in Warne Ranch. It also showed that Miriam Warne gave each of her granddaughters a 0.4% interest in VJK.

Also on May 19, 2015, Miriam Warne's estate timely filed (on extension) Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return. The Form 706 listed the following date-of-death values for the Family Trust's majority interests in the five LLCs: $18,006,000 for a 78% interest in WRW; $8,720,000 for a 72.5% interest in Warne Ranch; $11,325,000 for an 86.3% interest in VJK; $10,053,000 for an 87.432% interest in Warne Investments; and $25,600,000 for a 100% interest in Royal Gardens.

---

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[**13**] On the estate's Schedule O, Charitable, Public, and Similar Gifts and Bequests, the estate listed as charitable donations its 75% Royal Gardens donation to the Foundation, reported to be worth $19,200,000, and its 25% Royal Gardens donation to the Church, reported to be worth $6,400,000. Combined, those amounts equal the full value of the 100% ownership interest in Royal Gardens that was shown as being included in the estate.

IV.   Procedural History

On February 6, 2018, the Commissioner timely mailed the estate notices of deficiency determining a gift tax deficiency for 2012 and an estate tax deficiency.

In calculating the gift tax deficiency the Commissioner determined an $804,957 increase in the fair market value of the 18% gift interest in WRW, a $395,340 increase in the fair market value of the 22% gift interest in Warne Ranch, and a $27,534 increase in the fair market value of VJK. He also determined a $95,353 increase in gifts from prior periods. Additionally, the Commissioner determined a section 6651(a)(1) addition to tax of $90,195 for failure to timely file.

The Commissioner also determined an $8,351,970 estate tax deficiency. The Commissioner calculated this deficiency, in part, by determining increases in the values of the LLCs. The Commissioner also decreased the estate's charitable

[*14] contribution deduction for the split donation of Royal Gardens from $25,600,000 to $21,405,796.

The estate filed timely petitions on April 11, 2018, challenging the gift tax deficiency (docket No. 7019-18) and the estate tax deficiency (docket No. 7020-18). In its gift tax petition, the estate disputes the deficiency and the addition to tax, stating that the Commissioner erred when he adjusted the values of the gift LLC interests. In its estate tax petition, the estate disputes the entire deficiency, claiming the Commissioner erred when he increased the values of the estate and the LLCs. The estate also claims that it properly deducted the full value of Royal Gardens because Ms. Warne devised her entire interest in the LLC to charities.

Shortly before trial, the Commissioner filed a first amendment to answer asserting an increase to the gift tax deficiency, raising it to $368,452 and correspondingly increasing the section 6651(a)(1) addition to tax for failure to file to $92,113. The parties also submitted a first stipulation of settled issues that stipulated the fair market values of four properties held by the estate.

V. Expert Reports and Trial Testimony

Trial was held in Los Angeles, California, on September 11, 2019. At trial, both parties had expert witnesses testify to the values of the estate's properties. The issues remaining at trial were (1) the fair market values of the leased fee

[*15] interests in Tres Vidas, Brookhurst Town Center, and Windmill as of the 2012 gift date and the 2014 date of death; (2) the proper discounts for lack of control and marketability for the Family Trust's majority interests in the LLCs; (3) whether the minority interest discounts apply to the charitable contribution deductions of a 25% interest of Royal Gardens bequeathed to the Church and the remaining 75% interest bequeathed to the Foundation; and (4) whether the section 6651(a)(1) addition to tax applies.

### A. Appraisals for Leased Fee Gifts

Experts for each party prepared appraisals for Brookhurst Town Center, Tres Vidas, and Windmill as of the gift date. Stephen Roach prepared appraisals and testified for the estate. Bradley Lofgren did the same on behalf of the Commissioner. For each property, the experts valued the right to receive rent payments and reversionary interests. Both experts calculated the present value of each property by determining the fair market value of the land[4] and then ascertaining an appropriate discount rate to apply to that fair market value. The estate's expert used a 2.5% growth rate when calculating final present value totals.

---

[4]The lease for each property calculated rent as a percentage of the fair market value of the land.

[*16] The Commissioner's expert used a growth rate "consistent with our inflation assumption."

### 1. Brookhurst Town Center Appraisal

#### i. The Estate's Appraisal

Mr. Roach used both the direct capitalization and yield capitalization approaches to ascertain the fair market value of Brookhurst Town Center as of the date of the gift. The direct capitalization approach converts a property's first-year income into present value by applying a capitalization rate. Mr. Roach compared leased fee retail and ground lease capitalization rates from sales in Southern California that occurred within two years of the gift date. On the basis of the comparable properties, he determined that a 4.5% capitalization rate was appropriate. Mr. Roach then applied this capitalization rate to Brookhurst Town Center's $350,352 year 1 rent, resulting in a leased fee value of $7,790,000.

In his yield capitalization analysis, Mr. Roach used the sales comparison approach to find the fee simple value of the land.[5] Mr. Roach found five properties similar to Brookhurst Town Center that were sold near Westminster before

---

[5]The sales comparison approach values property by identifying the sales of comparably similar properties and making adjustments to the sale prices. Shepherd v. Commissioner, 115 T.C. 376, 390 n.12 (2000), aff'd, 283 F.3d 1258 (11th Cir. 2002).

[*17] December 2012. Mr. Roach then compared those properties to Brookhurst Town Center. He chose salient characteristics of the properties, such as access and exposure, location, and entitlements, and considered whether those characteristics were "inferior", "similar", or "superior" to those of Brookhurst Town Center. Mr. Roach valued one of these comparable properties, Red Hill, at $31 per square foot. He considered Red Hill to be superior to Brookhurst Town Center. From this analysis, Mr. Roach ascertained a value range between $23.53 and $33.35 per square foot and estimated a $29-per-square-foot value for Brookhurst Town Center, concluding with a fee simple land value of $5,840,000. When calculating the fee simple value, Mr. Roach considered risk, which he believed was inherent in the rent reset process: "Based on the arbitration process, a more conservative position in determining fee simple land value is warranted."

Mr. Roach then calculated the discount rate using data from PricewaterhouseCoopers (PwC) and the Real Estate Research Corp. (RERC). PwC reported that during the fourth quarter of 2012 the national strip shopping center data showed a discount rate range of 6.5% to 12.5%, with an average of 8.43%. RERC's national data for fall 2012 neighborhood and commercial retail centers showed a discount rate range of 6% to 11%, with an average of 8.4%. RERC's regional data for the Los Angeles market reported an 8.6% discount rate.

**[*18]** In his analysis, Mr. Roach noted that these datasets consisted of institutional-grade properties, while Brookhurst Town Center is considered a non-institutional-grade property. According to Mr. Roach, this discrepancy suggests a discount rate approximately 156 to 256 basis points higher than the PwC and RERC data indicate. Mr. Roach also considered the rent reset scheduled to take place in 2017, which he said, "adds an atypical layer of risk." He settled on an 8.75% discount rate for Brookhurst Town Center.

Using a 2.5% growth rate, Mr. Roach calculated $7,940,000 as the present value under the yield capitalization approach. He reconciled this amount with the direct capitalization figure, weighting them equally, for a value of $7,850,000.

### ii. The Commissioner's Appraisal

In his appraisal for the Commissioner, Mr. Lofgren used a discounted cashflow (DCF) analysis.[6] Like Mr. Roach, Mr. Lofgren used the sales comparison approach to find the fee simple land value. Mr. Lofgren found four properties sold near Brookhurst Town Center within 14 months before the gift date.

---

[6]For purposes here, the DCF analysis and the yield analysis used by the estate's expert are the same method of analysis.

[*19] Mr. Lofgren used a comparable method similar to Mr. Roach's. He compared characteristics of each property, such as the size and shape of the land, exposure, and location, with those of Brookhurst Town Center. He then applied a percentage positive or negative change in value of the price per square foot of the properties. Only one comparable, Red Hill, had no changes resulting from differences in the characteristics of the property. Red Hill had a price per square foot of $29.73. Mr. Lofgren estimated that Brookhurst Town Center was worth $32 per square foot for a total fee simple value of $6,400,000.

Mr. Lofgren combined multiple methods to calculate Brookhurst Town Center's discount rate. First, Mr. Lofgren looked at the yield rate of long-term Treasury bonds. He articulated parallels between these bonds and ground lease properties: (1) ground lease investments often extend for at least 30 years, which correlates with Treasury bond timeframes; (2) ground lease property and Treasury bonds generally are low risk; and (3) the cashflow payment schedule "for ground lease properties is clearly identified." Mr. Lofgren stated that he relied on 10- and 20-year Treasury bond yields because of the remaining term of the Brookhurst Town Center ground lease; but when Miriam Warne made the gifts, the lease term had 50 years remaining. He calculated a yield of 1.74% for the 10-year bonds and

**[\*20]** 2.48% for the 20-year bonds, to which he added 100 to 300 basis points as a liquidity or risk premium.

Mr. Lofgren also considered PwC's national strip shopping center data, which showed a discount rate range of 6.5% to 12.5%, with an average of 8.43%. And he used PwC's national net lease survey data, which showed a 7% to 9% discount rate range, with an average of 8.16%. He noted that the discount rate for Brookhurst Town Center must be "materially less" than the averages reported by PwC because ground leases are more secure and cover a longer period than the leases represented in PwC's data.

Mr. Lofgren then used the buildup method to calculate the final discount rate.[7] He took the riskless rate established by the 10- to 20-year bonds of 1.74% to 2.48% and added to them an illiquidity premium of 2.33% and a management fee premium of 1% to 2%. The buildup method yielded a discount rate of 5.07% to 6.81%. Mr. Lofgren determined that a discount rate "at the upper end of the

---

[7]"Under the build-up method, an appraiser selects an interest rate based on the interest rate paid on governmental obligations and increases that rate to compensate the investor for the disadvantages of the proposed investment." Estate of Gallagher v. Commissioner, T.C. Memo. 2011-148, 101 T.C.M. (CCH) 1702, 1711 n.15 (2011) (quoting Estate of Klauss v. Commissioner, T.C. Memo. 2000-191, 79 T.C.M. (CCH) 2177, 2180 n.11 (2000)), supplemented by T.C. Memo. 2011-244.

[*21] range" was appropriate after taking into account the near-term market adjustment. He concluded a 7% discount rate was appropriate.

At trial, Mr. Lofgren admitted that industry teachings state that using the buildup method to calculate discount rates for real estate "is usually not recommended." This admission contrasts with Mr. Lofgren's claim in his appraisal report that "[t]he Build-Up Method is considered to provide the most reliable indicator of the appropriate discount rate for the subject property." Mr. Lofgren also clarified that he did not distinguish between the investment-grade property data he used to find the discount rate and the non-investment-grade property he was appraising.

### 2. Tres Vidas and Windmill

Tres Vidas and Windmill are similar properties with nearly identical leases. The estate's expert, Mr. Roach, produced separate appraisals for Tres Vidas and Windmill. However, the valuation methods, comparable properties used, final price per unit, and discount rate analyses were identical in both reports. The Commissioner's expert, Mr. Lofgren, produced one appraisal for both properties, using the same comparable properties and methods and concluding the same price per unit and discount rate. Because the properties, leases, and appraisals are nearly identical, we will discuss Tres Vidas and Windmill together.

[*22]                    i.      The Estate's Appraisals

Mr. Roach used the yield capitalization method to value Tres Vidas and Windmill as of the date of the gift.  He began with the sales comparison approach to estimate the fee simple values of the land.  He found five comparable properties sold between August 2012 and April 2013.  To compare these properties with Tres Vidas and Windmill, Mr. Roach used the same "inferior", "similar", and "superior" designations he used for Brookhurst Town Center.  Mr. Roach found two of the comparable properties to be similar to the subject properties:  Knott Avenue at $51,750 per unit and West Lincoln Avenue at $59,793 per unit.  Mr. Roach testified that the West Lincoln property is "more comparable as it is similar in size and development potential."  Mr. Roach estimated that Tres Vidas and Windmill are valued at $52,000 per unit, for total fee simple values of $12,480,000 for Tres Vidas and $9,670,000 for Windmill.  Again, Mr. Roach took "a more conservative position in determining fee simple land value[s]" because of the upcoming rent resets.

Mr. Roach used the same method for the apartments' discount rate calculations that he used for Brookhurst Town Center.  Mr. Roach used discount rates compiled by PwC during the fourth quarter of 2012 in the Pacific region apartment market category.  The data showed a discount range of 5.25% to 12.5%,

**[\*23]** with an average of 8.48%. The data collected by RERC for the Los Angeles market showed a lower discount rate average of 7.4%. After an upward adjustment of 156 to 256 basis points to account for the noninstitutional nature of the subject properties, Mr. Roach concluded a 9.25% discount rate was appropriate for Tres Vidas and Windmill. Applying this discount rate, Mr. Roach calculated values of $10,290,000 for Tres Vidas and $7,970,000 for Windmill.

ii.     The Commissioner's Appraisals

Mr. Lofgren also began his appraisal of Tres Vidas and Windmill by using the sales comparison approach to discern the fee simple values of the land. Mr. Lofgren used five comparable properties, four of which the estate's expert also used. Mr. Lofgren compared the subject properties to the comparable properties and applied a percent value change to the comparable properties. Like Mr. Roach, Mr. Lofgren viewed the West Lincoln property as the most similar to the subject properties and ascertained a price per unit of $59,187 for West Lincoln. Mr. Lofgren estimated a value of $60,000 per unit and final fee simple land values of $14,400,000 for Tres Vidas and $11,160,000 for Windmill.

Mr. Lofgren's discount rate analysis for Tres Vidas and Windmill is identical to his analysis for Brookhurst Town Center, yielding the same 7% discount rate. Mr. Lofgren used the PwC national strip shopping center data as a

**[*24]** reference point for the apartments' discount rates. Mr. Lofgren testified that he made a mistake by using the strip shopping center data to calculate the discount rate for the apartment buildings but still considered the 7% discount rate to be appropriate. Mr. Lofgren calculated values of $16,920,000 for Tres Vidas and $13,110,000 for Windmill.

> B.      Appraisals for Leased Fees on Date of Death

Mr. Roach and Mr. Lofgren also appraised these same properties as part of the estate on the date of Miriam Warne's death. The date of death appraisals of Brookhurst Town Center, Tres Vidas, and Windmill followed the same method and used many of the same datasets as the gift date appraisals.

> 1.      Brookhurst Town Center

In the Brookhurst Town Center reports, the parties' experts agreed that the real estate market in February 2014 had improved since Miriam Warne transferred the LLC interests in December 2012.

> i.      The Estate's Appraisal

To calculate the fee simple value of the land, Mr. Roach used seven comparable properties.[8] He used four of these same comparable properties in the

---

[8]As with the gift date Brookhurst Town Center valuation, Mr. Roach did a direct capitalization analysis in addition to the yield capitalization analysis. The

[*25] gift date valuation. Two of the comparable sales occurred after the date of death. As with the gift date valuations, Mr. Roach used "inferior", "similar", and "superior" designations to measure the comparable properties' traits and market conditions against those of the subject property. He calculated an average price per square foot of $30.67 for the three properties that he considered to be the most similar to the subject properties. Mr. Roach concluded that Brookhurst Town Center's value was $30 per square foot for a total value of $6,040,000. Mr. Roach again addressed the impending rent reset, saying that "our conclusion resembles a prediction of the outcome in the arbitration. Based on the arbitration process, a more conservative position in determining fee simple land value is warranted."

The discount rate analysis for Brookhurst Town Center's date of death value followed the same pattern as the gift date analysis. The PwC fourth quarter 2013 national strip shopping center data listed a discount rate range of 5.5% to 11%, with an average of 8.05%. RERC's Los Angeles market average was slightly higher at 8.5%. As with the previous appraisals, Mr. Roach adjusted for the non-investment-grade property by increasing the data by 125 to 238 basis points. He

---

direct capitalization analysis valued Brookhurst Town Center at $8,760,000 as of the date of death.

[*26] concluded an 8.5% discount rate was appropriate. He calculated a final yield capitalization value of $8,720,000 for Brookhurst Town Center.[9]

### ii. The Commissioner's Appraisal

For his Brookhurst Town Center date of death appraisal, Mr. Lofgren used the same four comparable properties that he used for the gift date appraisal. The most recent sale of a comparable property occurred 26 months before Miriam Warne's death. However, Mr. Lofgren accounted for the improving market between the date of death and the comparable properties' sale dates by applying a percentage value increase to each property. Mr. Lofgren calculated that the average price per square foot of the adjusted comparable properties was $32.61. Mr. Lofgren weighted each property equally and concluded a final price of $35 per square foot for Brookhurst Town Center. His final fee simple value was $7 million.

Mr. Lofgren used the same discount rate analysis as in the gift date appraisals. Yield rates for 10- to 20-year Treasury bonds formed the base rate of 2.67% to 3.35%. The PwC national strip shopping center data for the first quarter of 2014 listed a discount rate range of 5.5% to 11%, with an average of 8.06% and

---

[9]Mr. Roach's total value of the property was $8,750,000. He reached this value by reconciling the direct capitalization amount of $8,760,000 with the yield capitalization value.

**[*27]** PwC's net lease discounts ranged from 7% to 9%, with an average of 7.94%. Mr. Lofgren again used the buildup method by adding 3.25% illiquidity premiums and 1% and 2% management fees to the base rate for a total discount range of 6.92 to 8.6%. He calculated a discount rate of 7%.

He calculated a rounded value of $12,240,000 for Brookhurst Town Center as of the date of death.

### 2. Tres Vidas and Windmill

#### i. The Estate's Appraisals

Mr. Roach used the sales comparison approach to value the estate's fee simple interests in Tres Vidas and Windmill. Mr. Roach used six comparable properties for the date of death appraisal, all of which sold before Miriam Warne's death. He used five of these comparable properties in the gift date appraisals. Mr. Roach noted that the two comparable properties, Knott Avenue (adjusted to $55,409 per unit) and West Lincoln (adjusted to $63,897 per unit), were "sufficiently similar" to the subject properties, but the West Lincoln property was "more similar" to both Tres Vidas and Windmill. He nevertheless aligned more closely with the "sufficiently similar" Knott Avenue property and estimated a per-unit value of $55,000 and total land values of $13,200,000 for Tres Vidas and $10,230,000 for Windmill. Mr. Roach cited the rent reset to explain this lower

**[*28]** price, stating that because of the three-appraiser process, a "more conservative * * * fee simple land value would be warranted."

Mr. Roach applied the same discount rate method he used previously. The PwC 2013 fourth quarter Pacific region apartment discount rate range was 5% to 12%, with an average of 7.35%. RERC reported an average discount rate of 7.3% in Los Angeles. Again, Mr. Roach increased the data by 125 to 238 basis points to account for the noninstitutional nature of the subject properties. He concluded that a 9% discount rate was appropriate for Tres Vidas and Windmill. The final calculations for the values of Tres Vidas and Windmill at the date of death were $12,130,000 and $9,390,000, respectively.

ii.     The Commissioner's Appraisals

Mr. Lofgren used six comparable properties in his fee simple analysis of Tres Vidas and Windmill. Each comparable property sold before Miriam Warne's death, and Mr. Lofgren used five of those six comparable properties in the gift date report. Four of those comparable properties were also used by the estate's expert. One of these overlapping comparable properties was the West Lincoln property. When comparing the West Lincoln property to the subject properties, Mr. Lofgren did not make adjustments to the property's value on the basis of its characteristics, indicating it was most similar to the subject properties. He listed the West Lincoln

**[*29]** price per unit as $63,533. Mr. Lofgren estimated $64,000 per unit, making the total fee simple values $15,360,000 for Tres Vidas and $11,900,000 for Windmill.

Mr. Lofgren used the identical discount rate analysis he employed for the date of death appraisal for Brookhurst Town Center, including the same datasets. He calculated a 7% discount rate for the apartments. He calculated final values of $18,380,000 and $14,230,000 for Tres Vidas and Windmill, respectively.

C.    Discounts for Lack of Control and Marketability

The parties agreed to apply discounts for lack of control and marketability for the Family Trust's majority interests in the LLCs on the date of death. The estate hired Philip Schwab as its expert, and the Commissioner hired Espen Robak. The experts drafted reports analyzing the appropriate discounts for each LLC. Both experts generated nearly identical reports for each LLC and concluded the same discounts applied to each LLC.

Because the LLCs were asset-holding entities, both parties used the Adjusted Net Asset Value (ANAV) approach to value the LLCs. The ANAV method calculates the current market value of a 100% controlling interest by subtracting the company's liabilities from its assets. However, the experts had different approaches to calculating the discounts.

**[\*30]**      1.      <u>Lack of Control</u>

            i.      <u>The Estate's Expert Report</u>

To calculate the discount for lack of control for the estate, Mr. Schwab used the Mergerstat Control Premium Study. The Mergerstat Study measured control premiums on transactions of publicly traded companies from 1986 to 2013. Mr. Schwab compared premiums paid to acquire 50.1% to 89.9% controlling interests with those paid to acquire 90% to 100% interests.[10] He stated that the difference in premiums between these two blocks indicates a possible discount for controlling interests that lack total control. The difference was a discount of 9.47%.

Mr. Schwab then considered factors specific to the LLCs at issue. He noted that the LLCs are real estate holding companies, which typically exhibit smaller discounts for lack of control, and are small, private companies. The report claimed that despite the majority interest holder's right to dissolve the company without input from the minority holders, "representatives of the Compan[ies] have indicated that any attempt to dissolve and liquidate the Compan[ies] would face strong opposition and potential litigation by the remaining member[s]." Mr.

---

[10]Because most publicly traded companies are incorporated in Delaware, Mr. Schwab used Del. Code Ann. tit. 8, sec. 253 (2021), as a benchmark. Mr. Schwab claims that section 253 allows shareholders with 90% control or more to freeze out minority shareholders.

[*31] Schwab sees this possibility of litigation as a source of significant expense for the majority interest holder. Nothing in the record indicates that Warne family members who own minority interests would pursue litigation if the majority interest holder dissolved the LLCs. Mr. Schwab concluded a discount for lack of control of 5% to 8% should be applied in the valuations of the LLCs.

ii.     The Commissioner's Expert Report

Mr. Robak used closed-end funds to calculate the discount for lack of control. Closed-end funds are publicly traded investment companies that raise a predetermined amount of capital. Mr. Robak favored closed-end fund data because of the active market for these securities and the abundance of available information contemporaneous with the valuation date. For his dataset, Mr. Robak used funds classified as real estate funds. He identified nine real estate funds in the dataset.

Using these nine funds, Mr. Robak compared distribution yields, total assets, market price, net asset value price, and discount or premium rate. This data showed a discount rate range of 3.5% to 15.7%, with a median discount rate of 11.9%. The data also showed one premium of 3.8%.

Mr. Robak then compared the closed-end funds to the subject interests. In his testimony, Mr. Robak stated that the controlling nature of the subject interests was the "main factor" for ascertaining the discount for lack of control. In contrast,

**[\*32]** the closed-end funds are "minority interests and completely devoid of any control." The amount of control exercised by the subject interest holders led Mr. Robak to conclude that a discount at the "bottom of the range" of the closed-end discount rates would be appropriate. Using this rationale, Mr. Robak determined a discount for lack of control of 2%.

In his report, Mr. Robak addressed the potential for litigation in the event of the majority interest holder's attempt to dissolve the LLCs. Mr. Robak saw attempts by minority interest holders to block liquidation, including pursuing litigation, as "merely a hypothetical possibility." He stated that documents reviewed for the report showed the Warne family's attachment to the LLCs' properties but not that the family would pursue legal action in the face of dissolution.

### 2. Lack of Marketability

#### i. The Estate's Expert Report

To measure the discount for lack of marketability, Mr. Schwab used discount data from restricted stock transactions. This data compares the prices of two identical securities: one fully marketable and one not fully marketable. The difference between these prices is a marketability discount. After adjusting for

[*33] outliers, Mr. Schwab was left with 714 transactions with an average discount of 21.1% and a median discount of 16.2%.

To estimate the appropriate discount for the subject LLCs, Mr. Schwab applied a two-step analysis.[11]  First, he identified the restricted stock equivalent discount, which would be the discount rate if the LLCs were publicly traded.  To identify the restricted stock equivalent discount, Mr. Schwab sorted the comparable stocks into quintiles on the basis of company size, balance sheet risk, and company-specific market risk.  He then placed the subject LLCs into quintiles on the basis of their characteristics and weighted these characteristics.

Mr. Schwab placed the LLCs in quintile 5 (highest discount rate) for total revenues and market values and quintile 3 for total assets.  Mr. Schwab gave these factors a medium weight.  Considering balance sheet risk, Mr. Schwab placed the LLCs in quintile 3 for their book values and quintile 1 (lowest discount rate) for market-to-book ratios.  He gave the market-to-book ratio significant weight.  Mr. Schwab put the LLCs in quintile 1 for market risk volatility, which he also gave significant weight.  Overall, Mr. Schwab calculated a restricted stock equivalent discount of 10% to 12%.

---

[11]Mr. Schwab in fact applied a three-step process.  However, he considered the second step to be inapplicable to the LLCs at issue.  Therefore, we will treat his analysis as a two-step process for our purposes.

[*34] At the second step of the analysis, Mr. Schwab applied holding period adjustments to account for the LLCs' liquidity. Mr. Schwab estimated a six-month holding period for the LLCs' assets. The dataset for companies with a six-month holding period contained 41 transactions. These transactions had an average discount rate of 9.7% and a median rate of 7.4%. Mr. Schwab applied a 25% downward adjustment to the discount rate to account for the shorter holding period of the LLCs. Mr. Schwab concluded an overall discount for lack of marketability of 5% to 10% for the LLCs.

ii.     The Commissioner's Expert Report

Mr. Robak used a similar approach to calculate the discount for lack of marketability. After removing statistical outliers from the Pluris DLOM Database,[12] Mr. Robak had a sample of 2,398 transactions, with an average discount of 21.4% and a median discount of 18.6%. He divided the dataset into quintiles according to discount rate, with quintile 1 showing the lowest discount rate. He calculated the median values of stock price per share, market value, book value, market-to-book ratio, trading volume, and block size of the companies within each quintile. Mr. Robak weighted every factor equally and calculated a

---

[12]The Pluris DLOM Database is a published database of private placement transactions used to analyze discounts for lack of marketability.

[*35] 14.5% average discount. He considered each LLC's strongest and weakest qualities and reached a final discount for lack of marketability of 2%.

### 3. The Estate's Rebuttal Report

The estate submitted a rebuttal report drafted by Jared Eichorst. Mr. Eichorst claims that the Commissioner's expert inappropriately used closed-end funds because the funds represent minority interests and the shareholders control neither the securities nor the real estate holdings. Mr. Eichorst concluded that the lack of similarities between the closed-end funds and the subject interests forced Mr. Robak to make "substantial subjective adjustments" to conclude a 2% discount for lack of marketability.

Mr. Eichorst also highlighted the potential for litigation if the majority interest holder chose to liquidate the LLCs. Mr. Eichorst claimed that any attempt by the majority interest holder to liquidate the LLCs may be challenged by the minority interest holders on the basis of a claim of breach of fiduciary duty. In his view, this potential litigation could thus result in significant legal expenses for the majority interest holder.

### 4. Final Discounts

Both Mr. Schwab and Mr. Robak combined their discounts for lack of control and marketability for a final total discount. Mr. Schwab concluded that

[*36] there should be a 10% total discount, whereas Mr. Robak concluded that there should be a 4% total discount.

VI.    Charitable Contribution Discount

The parties made a conditional stipulation regarding the estate's charitable contribution deduction of the 25% interest of Royal Gardens donated to the Church.  If we decide that a discount is appropriate for the 25% contribution, the parties stipulated a 27.385% discount and a total value of $4,650,000.

The parties also made a conditional stipulation regarding the estate's charitable contribution deduction of the 75% interest of Royal Gardens donated to the Foundation.  If we decide that a discount is appropriate for the 75% contribution, the parties stipulated a 4% discount and a total value of $18,443,000.

OPINION

The remaining issues to decide are:  (1) the fair market values of the leased fee interests as of the gift date; (2) the fair market values of the leased fee interests as of the date of Miriam Warne's death; (3) the appropriate discount for lack of control and marketability for the majority interests the Family Trust held in the LLCs; (4) whether a discount applies to the 25% interest in Royal Gardens that the estate donated to the Church and whether a 4% discount applies to the 75% interest

**[\*37]** donated to the Foundation; and (5) whether the section 6651(a)(1) addition to tax applies.

## I.  Burden of Proof

In general, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving otherwise.[13] However, the Commissioner bears the burden of proof on any new matter, increases in deficiency, or affirmative defenses pleaded in his answer.  Here, the Commissioner filed an amended answer asserting an increased deficiency and a corresponding increase in the addition to tax against the estate.  Except as to the addition to tax, where petitioners did not offer any proof as to reasonable cause, resolving these cases does not hinge on which party bears the burden of proof.  We base our conclusions on the preponderance of the evidence.[14]

## II.  Gift and Estate Tax Valuation Principles

Section 2501(a) imposes a gift tax for gifts made during the calendar year by individuals.  The donor is liable for this tax, which is based, in part, on the

---

[13]Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

[14]Estate of Mitchell v. Commissioner, T.C. Memo. 2011-94, 101 T.C.M. (CCH) 1435, 1438 (2011); Estate of Harper v. Commissioner, T.C. Memo. 2002-121, 83 T.C.M. (CCH) 1641, 1648 (2002).

[*38] aggregate sum of gifts made during the taxable year.[15] The value of a gift is the fair market value of the property on the date the donor made the gift.[16] Unless an alternative valuation date is elected, the value of a decedent's gross estate is the fair market value of the property included in the estate on the date of death.[17] For both estate and gift tax purposes, the fair market value of property is the price a willing buyer would pay a willing seller when neither is acting under compulsion and both have reasonable knowledge of the facts and circumstances.[18]

Valuation of property is a question of fact that we resolve by considering the entire record.[19] After we determine the value of the gross property, that value may increase or decrease if premiums or discounts apply.[20]

---

[15]Sec. 2502(a), (c).

[16]Sec. 2512(a).

[17]Secs. 2031(a), 2032.

[18]Sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs.; see also United States v. Cartwright, 411 U.S. 546, 551 (1973).

[19]Estate of Stevens v. Commissioner, T.C. Memo. 2000-53, 79 T.C.M. (CCH) 1519, 1521 (2000); Estate of Hinz v. Commissioner, T.C. Memo. 2000-6, 79 T.C.M. (CCH) 1289, 1296 (2000).

[20]Estate of Stevens v. Commissioner, 79 T.C.M. (CCH) at 1521.

[*39] Both parties relied extensively on experts to support their positions. We may use these experts' reports to guide our conclusions but are not bound by their methods or opinions.[21] One party's expert may be persuasive on one matter, while the other party's expert is persuasive on another; consequently, we may adopt portions of an expert's report while rejecting others.[22] Because valuation is not an exact science, our conclusions need not be specifically set forth in the record if they are properly deduced from the evidence.[23]

## III. Leased Fee Values as of the Gift Date

A leased fee interest in property is the right of the owner of income-producing property to receive contract rent plus the reversionary rights of the property once the lease has expired.[24] Appraisals of leased fee interests should reflect actual leases and expense structures, not hypothetical ones.[25]

---

[21]Estate of Stevens v. Commissioner, 79 T.C.M. (CCH) at 1521.

[22]Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Estate of Stevens v. Commissioner, 79 T.C.M. (CCH) at 1521-1522.

[23]Estate of Lehmann v. Commissioner, T.C. Memo. 1997-392, 74 T.C.M. (CCH) 415, 417 (1997).

[24]Marks v. Commissioner, T.C. Memo. 1985-179, 49 T.C.M. (CCH) 1222, 1226 (1985); Appraisal Institute, The Appraisal of Real Estate 72 (14th ed. 2013).

[25]Estate of Mitchell v. Commissioner, 101 T.C.M. (CCH) at 1439; Appraisal Institute, supra, at 460. Experts employed by both the estate and the

[*40] A.    Brookhurst Town Center

Mr. Roach, the estate's expert, used both the direct capitalization and yield capitalization approaches to deduce the fair market value of Brookhurst Town Center.  Mr. Lofgren, the Commissioner's expert, used only the yield capitalization approach.  The yield capitalization approach is more appropriate for valuing leasehold interests like Brookhurst Town Center.[26]  Therefore, we will consider only Mr. Roach's yield capitalization figures in our analysis.

To determine the fee simple value of Brookhurst Town Center, both experts used the sales comparison approach.  One comparable used by Mr. Lofgren was Red Hill.  Mr. Lofgren made no adjustments for Red Hill, indicating it was the property most comparable to Brookhurst Town Center.  If a comparable property warrants no adjustments, that property should be given greater weight in determining the value of the subject property.[27]  Mr. Lofgren valued Red Hill at $29.73 per square foot.  He adjusted the next most comparable property down 5% to $29.38 per square foot.  But Mr. Lofgren concluded that Brookhurst Town

---

Commissioner cited The Appraisal of Real Estate in their reports, and excerpts from the text were entered into the record.

[26]Appraisal Institute, supra, at 506.

[27]Appraisal Institute, supra, at 393.

[*41] Center should be valued at $32 per square foot. Mr. Roach also used Red Hill as a comparable property. He valued Red Hill at $31 per square foot, finding it superior to Brookhurst Town Center. Mr. Roach concluded Brookhurst Town Center's value was $29 per square foot.

We hesitate to adopt Mr. Roach's fee simple valuation. The Commissioner argues that the estate's consideration of risk when calculating the fee simple value of the property is improper. We find this argument compelling. Mr. Roach's tendency to take "a more conservative position in determining fee simple land value" to account for the impending rent reset misplaces the accounting of risk. When appraising an investment property, risk and uncertainty are accounted for in the discount rate.[28] Adjusting the fee simple value of the land to account for this risk and then applying a discount rate that also factors in this risk is inappropriate because it, in effect, double-counts risk. But we also cannot accept Mr. Lofgren's $32-per-square-foot valuation. Mr. Lofgren found Red Hill to be the comparable property most similar to Brookhurst Town Center, pricing it at $29.73 per square foot and making no qualitative adjustments justifying his increase of the value to

---

[28]Appraisal Institute, supra, at 440.

[*42] $32 per square foot. We find that a price of $30 per square foot is appropriate for Brookhurst Town Center.[29]

We adopt the estate's discount rate of 8.75%. Mr. Roach used a reasonable method and made adjustments to the data to account for Brookhurst Town Center's traits and the rent reset risk. In contrast, Mr. Lofgren's process went against industry standards. Mr. Lofgren calculated his discount rate by adding "the safe rate plus considerations of illiquidity, management, and various risks" which "can be misleading and inaccurate."[30] Mr. Lofgren also employed the buildup method, which he admitted at trial "is not usually recommended" for real estate appraisals. We thus decline to accept the Commissioner's proposed discount rate.

B.    Tres Vidas and Windmill

To find the fee simple values of the apartments, both experts opined that the West Lincoln property was most comparable to the subject properties. Because the West Lincoln property was most comparable, its value is given more weight. The estate valued West Lincoln at $59,793 per unit and the Commissioner valued it at $59,187 per unit. Because both parties believed West Lincoln was most

---

[29]Both experts rounded their findings to whole dollar amounts. We will do the same.

[30]Appraisal Institute, supra, at 458.

[*43] comparable to the apartments, we abide by their West Lincoln valuations. The price per unit of Tres Vidas and Windmill is thus $59,500, the approximate average between both parties' West Lincoln estimated valuations.

As with Brookhurst Town Center, the estate presented a better argument for its discount rate. Mr. Roach followed industry standards while Mr. Lofgren did not. The discount rate for Tres Vidas and Windmill for the gift date is 9.25%.

IV.     Leased Fee Values as of the Date of Death

A.     Brookhurst Town Center

In his estimate of Brookhurst Town Center's fee simple value, Mr. Roach identified three properties that he considered to be most comparable to Brookhurst Town Center. He calculated $30.67 to be the average price per square foot of the properties and valued Brookhurst Town Center at $30 per square foot. Again, we hesitate to adopt Mr. Roach's fee simple value because he stated in his report that "[b]ased on the arbitration process, a more conservative position in determining fee simple land value is warranted." And as explained above, Mr. Roach improperly accounted for risk in both the fee simple value of the property and the discount rate. We thus turn to the valuation conducted by the Commissioner's expert.

In his analysis, Mr. Lofgren used the same four comparable properties in his date of death valuation that he used in the gift date valuation. He applied a

**[*44]** percentage adjustment to account for improving market conditions from the sale date of the comparable property to the date of death. Mr. Lofgren calculated the comparable properties' average value to be $32.61 per square foot but opined that Brookhurst Town Center was worth $35 per square foot. This value is artificially high and does not comport with the comparable property data he provided. Because Mr. Roach inappropriately lowered his valuation and Mr. Lofgren inexplicably increased his final valuation, we will accept Mr. Lofgren's average comparable value. We value Brookhurst Town Center at $32 per square foot.

For the same reasons articulated above, the estate used a more reliable method in determining its discount rate, and we find its discount rate to be more credible. The discount rate for Brookhurst Town Center on the date of death is 8.5%.

### B. Tres Vidas and Windmill

The experts' date of death appraisals for Tres Vidas and Windmill borrow heavily from their gift date appraisals. Mr. Roach used six comparable properties, five of which he also used in the gift date appraisal. Once again, Mr. Roach noted that the West Lincoln property had the most similarities to the subject properties. He valued West Lincoln at $63,897 per unit. Mr. Lofgren also used six

[*45] comparable properties, five of which he used in the gift date appraisal. He also determined that West Lincoln, which he valued at $63,533 per unit, bore the most similarities to the subject properties. Because both experts considered the West Lincoln property most similar to the subject properties, we give the West Lincoln property the most weight in finding the fee simple value. As with the gift date appraisal, we will average the two experts' value estimates for West Lincoln to find our valuation of the subject properties. Therefore, the price per unit of Tres Vidas and Windmill is $63,750.

Once again, for reasons stated above, we adopt the estate's discount rate. The date of death discount rate for Tres Vidas and Windmill is 9%.

## V. Discounts for Lack of Control and Marketability

Both parties applied discounts for lack of control and marketability to the majority interests in the LLCs held by the Family Trust.

### A. Discount for Lack of Control

The discount for lack of control for the majority interests held by the Family Trust should be low. The LLCs' operating agreements grant significant power to the majority interest holder, such as the ability to unilaterally dissolve the LLCs and appoint and remove managers. The Family Trust held the majority interest in every LLC at issue. When a majority interest holder exerts control similar to that

[*46] which the Family Trust can exercise in the LLCs, we have held that no discount for lack of control applies.[31]  Because the parties agree to a discount for lack of control, we will find one; however, given the control retained by the Family Trust, the discount should be slight.

The Commissioner's expert, Mr. Robak, estimated a discount for lack of control of 2%.  To arrive at this conclusion, Mr. Robak used nine closed-end funds as a discount for the lack of control dataset.  The estate argues that using closed-end funds to find a discount rate for a majority interest is unsound.  We have accepted valuations of discounts based on closed-end funds, but appraisers used these funds to discern minority-interest discounts, not discounts for lack of control for a majority interest.[32]  In Grieve v. Commissioner, we accepted closed-end funds to calculate the discount for lack of control for majority interests in LLCs.[33]

---

[31]Estate of Jones v. Commissioner, 116 T.C. 121, 135 (2001); Estate of Streighthoff v. Commissioner, T.C. Memo. 2018-178, at *4-*5, *23, aff'd, 954 F.3d 713 (5th Cir. 2020).

[32]See, e.g., Estate of Richmond v. Commissioner, T.C. Memo. 2014-26 (prevailing party used closed-end funds for minority interest discounts); Estate of Kelley v. Commissioner, T.C. Memo. 2005-235, 90 T.C.M. (CCH) 369, 372 (2005) (finding closed-end funds appropriate for determining minority interest discount for an LLC that held cash and securities); Peracchio v. Commissioner, T.C. Memo. 2003-280, 86 T.C.M. (CCH) 412, 415-416 (2003) (opposing parties used closed-end funds to calculate a minority interest discount).

[33]Grieve v. Commissioner, T.C. Memo. 2020-28, at *12, *36.

**[\*47]** But the appraiser in <u>Grieve v. Commissioner</u>, at \*12, used the premium-control data for the minority stock interests in the closed-end funds, not discount data from the minority interests as the Commissioner's expert did here. Furthermore, the majority interests valued in <u>Grieve v. Commissioner</u>, at \*9-\*10, lacked voting power, making the interests more similar to a minority interest; here, the majority interests control and wield considerable power over the LLCs.

We also consider these closed-end funds to be too dissimilar to the subject LLCs. The closed-end funds used by Mr. Robak are publicly held investment funds of marketable securities backed by real estate holdings. Unlike the subject LLCs, these closed-end funds do not directly hold real estate. Rather, they hold small, minority interests, and by Mr. Robak's admission, "don't control the entity at all, unlike * * * [the] subject interest[s]." Furthermore, Mr. Robak chose only nine closed-end funds for the dataset from which he derived the discount for lack of control. When an appraiser uses comparables dissimilar to the subject properties, the sample size of the comparables should generally increase.[34] This

---

[34]<u>Lappo v. Commissioner</u>, T.C. Memo. 2003-258, 86 T.C.M. (CCH) 333, 336 (2003); <u>Heck v. Commissioner</u>, T.C. Memo. 2002-34, 83 T.C.M. (CCH) 1181, 1187 (2002) ("As similarity to the company to be valued decreases, the number of required comparables increases in order to minimize the risk that the results will be distorted by attributes unique to each of the guideline companies.").

**[\*48]** did not happen here.  Because Mr. Robak's dataset is inappropriate for the LLCs, we decline to adopt his 2% discount rate.

The estate's expert, Mr. Schwab, compared premiums from completely controlling interests in companies with premiums from interests that lacked full control to find a discount rate.  He then considered qualities specific to the subject LLCs to yield a discount for lack of control of 5% to 8%.  While Mr. Schwab's method appears sound, he did not provide the Court information regarding the size and makeup of his sample.

We hesitate to adopt Mr. Schwab's conclusion because he proposes a higher discount for lack of control to account for the risk of potential litigation.  Mr. Schwab speculates that any attempt by the majority interest holder to dissolve the LLCs would be met with "strong opposition and potential litigation" from other Warne family members.  We cannot give any meaningful weight to his speculation.

The Supreme Court in <u>Olson v. United States</u> stated:  "Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and

**[\*49]** conjecture to become a guide for the ascertainment of value."[35]  Mr.

Schwab's contention that Warne family members would pursue litigation upon

dissolution is based on speculation.  He cites the properties' low bases and duration

with the family as evidence of future litigation.[36]  While litigation may have been

within the realm of possibility, the estate failed to show this outcome was

reasonably probable.  The estate did not submit evidence showing the litigiousness

of the minority interest holders, nor did it question William Warne regarding his

views on dissolving the LLCs.  The record thus does not contain any evidence

showing that family members owning minority interests would pursue litigation if

the majority interest holder dissolved the LLCs.  We therefore do not consider

impending litigation as a determinable factor in the discount for lack of control.

---

[35]Olson v. United States, 292 U.S. 246, 257 (1934).

[36]Mr. Schwab stated in his report that "representatives of the company have indicated that any attempt to dissolve and liquidate the Compan[ies] would face strong opposition and potential litigation by the remaining member[s]."  On cross-examination, Mr. Schwab admitted that he misrepresented the aforementioned "representatives" as "representative[s] of the company[ies]" when the individual he spoke with was in fact counsel for the owners.  Fed. R. Evid. 702 and 703 allow experts to rely on evidence outside the trial record, which may include inadmissible hearsay.  However, this information is admitted only to understand or explain the expert's basis for an opinion and not for the truth of the matter asserted. H Grp. Holding, Inc. v. Commissioner, T.C. Memo. 1999-334, 78 T.C.M. (CCH) 533, 549-550 (1999).  We therefore accept that Mr. Schwab used the information he gleaned from the representative in forming his opinion, but we do not accept this information as evidence that litigation was a probable outcome of dissolution.

**[\*50]** Because we will not consider the risk of impending litigation, the discount for lack of control should be lower than the 5% to 8% range suggested by the estate. A discount for lack of control of 4% is appropriate.

B. Discount for Lack of Marketability

The parties' experts used the same general method to calculate their discounts for lack of marketability. Both experts calculated the LLCs' restricted stock equivalent discounts and adjusted that calculation to account for the LLCs' characteristics to reach the final discount for lack of marketability. However, Mr. Schwab's analysis was more credible. His report considered additional metrics and provided a more thorough explanation of his process. In calculating the restricted stock equivalent discount, he determined the most important factors-- such as the market-to-book ratio and market risk volatility--and he gave them more significant weight in his analysis. Mr. Schwab concluded a 10% to 12% restricted stock equivalent discount and decreased it by 25% as a holding period adjustment. He opined that a 5% to 10% discount for lack of marketability should apply.

In contrast, Mr. Robak concluded a 2% discount for lack of marketability, providing little information to support this conclusion. In calculating the restricted stock equivalent discount, Mr. Robak weighted every factor equally and reached a 14.5% restricted stock equivalent discount. He then calculated a 2% discount for

[*51] lack of marketability without justifying the substantial decrease in the discount. When an expert does not provide enough evidence to support his opinion, we decline to adopt that opinion.[37] Without justification for his conclusion, it appears Mr. Robak made a visceral reduction of the discount rate data instead of a statistical one.[38] We therefore decline to adopt the Commissioner's discount for lack of marketability analysis.

We adopt Mr. Schwab's lack of marketability discount but believe it should remain at the lower end of the 5% to 10% range. Therefore, the discount for lack of marketability for the LLCs is 5%.

VI.    Charitable Contribution Discount

Upon her death, Miriam Warne's estate donated 75% of Royal Gardens to the Foundation and 25% to the Church. The Commissioner asserts that we should apply discounts for lack of control and marketability to the charitable contribution deductions attributable to the estate's donations to the Church and the Foundation. The Commissioner argues that the value of the deduction should reflect the benefit received by the respective donees.

---

[37]Grieve v. Commissioner, at *35-*36.

[38]See Estate of Richmond v. Commissioner, at *41.

**[*52]** The estate insists that discounts are inappropriate and would subvert the public policy of motivating charitable donations. It claims that because 100% of Royal Gardens was included in the estate and the estate donated 100% of Royal Gardens to charities, the estate is entitled to a deduction of 100% of Royal Gardens' value. We disagree.

Both parties cite Ahmanson Foundation v. United States for support.[39] In Ahmanson, the decedent owned (through a revocable trust) a corporation that had 100 shares. Only one of those shares was a voting share; the remaining 99 shares were nonvoting. The decedent bequeathed the one voting share to his son and the 99 nonvoting shares to a charitable foundation.[40] The Court of Appeals for the Ninth Circuit in Ahmanson stated that "[t]here is nothing in the statutes or in the case law that suggests that valuation of the gross estate should take into account that the assets will come to rest in several hands rather than one."[41] In other words,

---

[39]Ahmanson Found. v. United States, 674 F.2d 761 (9th Cir. 1981). Because these cases are appealable to the Court of Appeals for the Ninth Circuit, we follow its approach. Golsen v. Commissioner, 54 T.C. 742, 756 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

[40]Ahmanson Found., 674 F.2d at 765-766.

[41]Ahmanson Found., 674 F.2d at 768.

[*53] when valuing an asset as part of an estate, we value the entire interest held by the estate, without regard to the later disposition of that asset.

But when property is split as part of a charitable contribution, a different principle applies. "The valuation of these same sorts of assets for the purpose of the charitable deduction, however, is subject to the principle that the testator may only be allowed a deduction for estate tax purposes for what is actually received by the charity--a principle required by the purpose of the charitable deduction."[42] In short, when valuing charitable contributions, we do not value what an estate contributed; we value what the charitable organizations received.

Taking these two principles together, the estate must include 100% of the value of Royal Gardens in the value of the estate, but the estate may deduct only the 25% and 75% interests received by the respective charities.

In its opinion, the Court of Appeals in Ahmanson cited section 2055(d), which provides that an estate's charitable contribution deduction for transferred property may not exceed that property's value in the gross estate.[43] It concluded that the estate's deduction attributable to the donation of the 99 nonvoting shares

---

[42]Ahmanson Found., 674 F.2d at 772.

[43]Ahmanson Found., 674 F.2d at 772.

**[\*54]** necessitated a 3% discount to account for the foundation's lack of voting rights.[44]

The estate asks us to distinguish its donation from the one in <u>Ahmanson</u>. It emphasizes that the voting share in <u>Ahmanson</u> went to the decedent's son and not a charitable organization. It claims that because Miriam Warne donated 100% of Royal Gardens' value to charitable organizations, a discount should not apply. However, whether a charitable organization or an individual received the 75% interest in Royal Gardens does not affect the value of the Church's interest, and it is the value of the property received by the donee that determines the amount of the deduction available to the donor.

A discount applies to the charitable contribution deduction for the estate's donation of Royal Gardens. The parties stipulated that a 27.385% discount is appropriate for the 25% interest. Likewise, the parties stipulated that a 4% discount also applies to the estate's 75% donation to the Foundation.

## VII.    Section 6651(a)(1) Addition to Tax for Failure to Timely File

The Commissioner contends that the estate owes an addition to tax under section 6651(a)(1) because Ms. Warne failed to timely file a 2012 gift tax return. Section 6651(a)(1) imposes an addition to tax on taxpayers who fail to timely file a

---

[44]<u>Ahmanson Found.</u>, 674 F.2d at 772.

[*55] required return unless the taxpayer can show the failure to file was due to reasonable cause and not willful neglect.  A failure to timely file results in an addition of 5% of the net amount due for every month the return was late, not to exceed 25% of the base amount owed.[45]  The Commissioner bears the burden of production showing the taxpayer filed a late return.[46]  The taxpayer bears the burden of showing reasonable cause.[47]

Miriam Warne gave interests in the LLCs to her family members in 2012. Section 6075(b)(1) required that she file the gift return by April 15, 2013.  The estate filed the return on her behalf on May 19, 2015, without an extension.  The Commissioner has shown that the gift tax return was untimely.  The estate claims Ms. Warne had reasonable cause for this untimely filing but has not offered any evidence in support of this claim.  Therefore, the section 6651(a)(1) addition to tax applies if Rule 155 computations show a gift tax deficiency.

---

[45]Sec. 6651(a)(1), (b)(1); United States v. Boyle, 469 U.S. 241, 245 (1985).

[46]Sec. 7491(c).

[47]Russell v. Commissioner, T.C. Memo. 2011-81, 101 T.C.M. (CCH) 1363, 1365 (2011).

**[\*56]** To reflect the foregoing,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.